# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 15-920V
Filed: April 19, 2018
To Be Published

```
*************************************
V.L.,                                *
                                     *
            Petitioner,              *
                                     *
 v.                                  *   Influenza and Pneumovax vaccines;
                                     *   allegation of right frozen shoulder when
SECRETARY OF HEALTH                  *   influenza vaccine injected into left arm;
AND HUMAN SERVICES,                  *   42 U.S.C. § 300aa-13(a)(1); no six months
                                     *
            Respondent.              *
                                     *
*************************************
```

<u>Michael A. Firestone</u>, San Mateo, CA, for petitioner.
<u>Lynn E. Ricciardella</u>, Washington, DC, for respondent.

**MILLMAN, Special Master**

## DECISION[1]

     On October 24, 2015, petitioner filed a petition *pro se* under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that influenza ("flu") vaccine administered on September 11, 2012 caused her a right frozen shoulder.  Pet. Preamble and ¶ 2.

     Petitioner filed as Exhibit 1 her vaccination record which did not reveal in which arm she received flu vaccine.  Med. recs. Ex. 1, at 2.  On the same date on which petitioner received flu vaccine, she received Pneumovax, a vaccine not listed on the Vaccine Injury Table.  <u>Id.</u>  The vaccine record petitioner filed also does not list in which arm she received Pneumovax.  <u>Id.</u>

     On January 15, 2016, counsel moved to substitute as petitioner's attorney, which was consented to on January 19, 2016.  On July 19, 2016, petitioner filed an amended petition. Besides repeating petitioner's initial allegation that flu vaccine caused her a right frozen shoulder

---

[1] Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy.  When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's enclosure.  If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.  The undersigned is redacting petitioner's name to her initials sua sponte in light of the highly personal medical records described herein.

and adding an allegation of brachial neuritis (Parsonage-Turner Syndrome), petitioner in her amended petition alleges, in the alternative, that flu vaccine caused a significant aggravation of an underlying arthritic shoulder condition that was asymptomatic until her September 11, 2012 vaccination.  Am. Pet. Preamble and at ¶¶ 22, 23.  Petitioner attempted to support her allegation that she received the flu vaccine in her right arm by referencing her affidavit (Ex. 18), her daytimer (Ex. 22), and her husband's affidavit (Ex. 19), but she did not reference the vaccine record which documents she received flu vaccine in her left deltoid.

Petitioner's counsel filed numerous records, including Exhibit 14, which constitutes the vaccine record for FluZone administered to petitioner on September 11, 2012 in her left arm ("left deltoid").  Med. recs. Ex. 14, at 2.  The vaccine record also documents petitioner received a pneumonia vaccine on September 11, 2012, without specifying in which arm she received it.  Id. at 3, 4.  Thus it is unclear whether Pneumovax was injected into petitioner's left arm together with her flu vaccination or injected into her right arm.  What is clear is that the only medical record contemporaneous with petitioner's flu vaccination, i.e., the vaccine record, states that she received flu vaccine in her left deltoid.

A hearing was held on September 6, 2017.  Petitioner, her husband, and one of her massage therapists, Stewart Walker, testified.

Petitioner filed her posthearing brief on December 4, 2017.

Respondent filed his posthearing brief on February 2, 2018.

Petitioner filed her reply brief on February 22, 2018.

The Vaccine Act, § 300aa-13(a)(1), states the undersigned may not rule in favor of petitioner "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion."  The vaccination record pertaining to flu vaccine contradicts petitioner's recollections described in her affidavit, her date book, and her husband's affidavit.  The vaccination record pertaining to flu vaccine also contradicts petitioner's testimony and that of her husband at the hearing.  The undersigned does not find petitioner's testimony or that of her husband to be credible.  Thus, petitioner has not proven that flu vaccination in her left deltoid caused her a right frozen shoulder.

But even if, arguendo, the vaccine record that petitioner received flu vaccine in her left deltoid were wrong and she in fact received flu vaccine in her right shoulder, the undersigned does not find the testimony of petitioner, her husband, and one of her physical therapists to be credible, nor the written statement of her other physical therapist.  Two of petitioner's treating doctors, Dr. Neelon and Dr. Lewis, refused to support her allegations.  An expert to whom petitioner's attorney sent her refused to support petitioner's allegations.  The undersigned finds that petitioner's flu vaccination did not cause petitioner a right frozen shoulder.

The undersigned finds that petitioner's September 11, 2012 flu vaccination did not cause

2

her right frozen shoulder, that petitioner never had SIRVA (shoulder injury related to vaccine administration), that she never had brachial neuritis (Parsonage-Turner syndrome), and that the September 11, 2012 flu vaccination did not significantly aggravate petitioner's osteoarthritic right shoulder.  This case is dismissed with prejudice.

## FACTS

## Prevaccination Records

Petitioner was born on January 17, 1940.  She is 78 years old.

On September 18, 2006, petitioner had an MRI of her cervical spine done because of chronic neck and spinal pain.  The MRI showed she has facet degenerative changes at C4-C5, C5-C6, and C6-C7, as well as foraminal stenosis[2] at multiple levels.  Id.

On February 21, 2007, Dr. Francis A. Neelon[3] of the Rice Clinic[4] in Durham, NC, to which petitioner had gone for weight loss, noted a telephone call from petitioner that she had a "meltdown" the prior week and ate sweets addictively.  Med. recs. Ex. 2, at 2.

On March 27, 2008, petitioner was diagnosed with osteoporosis.  Med. recs. Ex. 76, at 191.  Also on March 27, 2008, the results of petitioner's pelvic ultrasound showed a fundal calcified fibroid measuring 1.7 cm, minimally enlarged compared to a prior pelvic ultrasound dated March 1, 2006.  Id. at 193.

On April 5, 2008, petitioner wrote a letter to Dr. Neelon, stating, "Greetings and blessings and I hope you and your family are very very well.  I think of you often, and wish I lived closer to Durham." Med. recs. Ex. 6, at 12.  She enclosed her new book for Dr. Neelon and said she would be interested in his feedback.  Her concern also was her recent bone density tests which showed her "bones are deteriorating." Id.  Since her mother had osteoporosis, petitioner said she was very concerned and asked Dr. Neelon to give her a program for systematically addressing bone health.  She wrote all she was doing in terms of activities and diet, closing with "Thank you so much for all your help over these years.  God's blessings." Id.

On February 25, 2009, petitioner filled out a questionnaire for Sutter East Bay and stated she had constant leg pain and neck pain.  Med. recs. Ex. 75, at 6.  She also listed Dr. Michael

---

[2] "Stenosis" is an "abnormal narrowing of a duct or canal."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1769 (32nd ed. 2012) [hereinafter "Dorland's"].  "Foramen" is "a natural opening or passage, especially one into or through a bone." Id. at 729.

[3] Dr. Francis Neelon is an endocrinologist who received his medical degree in 1962 from Harvard Medical School with affiliations with Duke Regional Hospital and Duke University Hospital.  Dr. Francis Neelon, U.S. NEWS, https://health.usnews.com/doctors/francis-neelon-113941 (last visited March 5, 2018).

[4] The Rice House Healthcare Program is based on the rice diet to allow patients to reduce or eliminate medications because they have "embraced the healthy lifestyle of eating the right amounts of the right kinds of foods and undertaking daily rounds of low-intensity exercise." RICE HOUSE HEALTHCARE PROGRAM, http://www.ricehouse.org (last visited March 5, 2018).

Lewis[5] as her personal care physician ("PCP").  Id.  She noted she had intermittent and situational depression, weight gain, sleep disturbance, vaginal dryness, and painful intercourse. Id. at 7.

On March 18, 2009, petitioner had a pelvic ultrasound done because she gave a history of intermittent pelvic pain.  Med. recs. Ex. 76, at 190.  Dr. Scott A. Lipson's impression was no significant abnormality.  A small calcified fibroid was present.  Id.

On March 23, 2009, Dr. Neelon noted petitioner had a bilateral knee x-ray which showed calcifications and bilateral mild medial hip joint space narrowing.  Med. recs. Ex. 2, at 3.  Dr. Neelon did a physical examination of petitioner on the same date, noting right hip and leg pain. Id. at 42.  About one month previously, she developed pain in her right hip and then down her leg.  It was troublesome when she walked, especially up and down stairs, but even while lying in bed.  Id.

On April 3, 2009, Dr. Neelon noted petitioner had pain in her knees, right hip, and right tibia (mid-shaft).  Id.  He said he would x-ray her tibia and start her on aspirin or ibuprofen.  Id.

On June 2, 2009, petitioner saw Nurse Practitioner ("NP") Alice Cannan for an annual examination.  Med. recs. Ex. 76, at 339.  Petitioner had weight gain and an increase in abdominal girth.  She was worried about ovarian cancer due to her mother's history of colon and uterine cancer.  Petitioner had pain in her right leg from her hip joint all the way down her leg. Osteoporosis was diagnosed in 2008, but petitioner never came into the office for discussion.  Id. She had intermittent stiffness in her neck.  Id. at 341.

On June 9, 2009, petitioner saw NP Cannan because of some abdominal distension and bloating after meals.  Id. at 337.  Petitioner complained of pain in her right hip joint down to her shin.  She was worried about blood clots.  She went to a body worker which helped, but relief was transient.  She saw an orthopedist twice and received cortisone injections with some relief. She went to a clinic at Duke where she had x-rays of her leg, her hip, and right knee showing less cartilage.  Id.  She saw a doctor at Duke and discussed osteoporosis.  She was taking calcium and vitamin D now but had not started Fosamax.  She was having hypothyroid symptoms and was working on getting her thyroid medication adjusted.  She noted some abdominal distension and bloating after meals.  On physical examination, petitioner had poor muscle tone.  NP Cannon referred petitioner to an orthopedist for her right leg pain.  Id.

On May 10, 2010, petitioner filled out a questionnaire for Sutter East Bay and stated she had knee pain and stiffness.  Med. recs. Ex. 75, at 4, 5.  She listed her PCP as Dr. Kate Westbrook.  Id. at 4.

---

[5] Dr. Michael H. Lewis is a family medicine doctor who graduated from Northeastern Ohio Universities College of Medicine.  Michael H. Lewis, MD, WebMD, https://doctor.webmd.com/doctor/michael-lewis-md-18356894-3646-437c-895c-a4c4b7387860-overview (last viewed March 5, 2018).

On October 18, 2010, petitioner was again diagnosed with osteoporosis.  Med. recs. Ex. 76, at 106.

On October 20, 2010, Dr. Neelon did an examination of petitioner, noting her problem list of osteoporosis, insomnia, hypothyroidism, overweight, knee pain, decreased vision, neck arthritis, and hearing loss.  Med. recs. Ex. 2, at 31.  He noted that guitar lessons replaced her exercise program.  Id.  She tore her right knee meniscus about 18 years previously which surgery in 1985 helped, but petitioner still could not fully extend her right leg.  An x-ray in 2009 showed arthritis and doctors said she needs a knee replacement.  She had whiplash many years ago and now had limited neck range of movement, especially on the left.  Id.

On October 28, 2010, Dr. Neelon noted Dr. Attarian's diagnosis of petitioner's right knee pain as osteoarthritis.  Med. recs. Ex. 2, at 3.  Petitioner saw Dr. David E. Attarian at Duke University Medical Center, Department of Orthopedics, on October 28, 2010 for an evaluation of her right knee pain.  Med. recs. Ex. 3, at 1.  In his review of systems, Dr. Attarian noted petitioner had difficulty tolerating stress as well as significant joint pain or stiffness.  Id.  Dr. Attarian diagnosed petitioner with right knee osteoarthritis.  Id. at 2.

On September 26, 2011, Dr. Thomas P. Vail, Professor and Chairman of the Department of Orthopaedic Surgery of the University of California San Francisco ("UCSF") Arthritis and Joint Replacement Center, saw petitioner and evaluated the x-rays of her painful right knee, which showed bone-on-bone joint space narrowing in the lateral compartment and moderate degenerative changes in the medial and patellofemoral compartment with osteophytes in the posterior compartment.  Med. recs. Ex. 5, at 4. 5.  Dr. Vail diagnosed petitioner with symptomatic right knee osteoarthritis.  Id. at 4.

On September 27, 2011, Dr. Vail dictated a note on petitioner's visit.  Id. at 1.  Petitioner had increasing pain over the prior four to five years.  Over the past several months, the pain was interfering with her activities of daily living, her independent living, and her quality of life.  She now had pain daily even while trying to sit and play the guitar.  Id.  X-rays showed advanced degenerative arthrosis of the right knee with valgus gonarthrosis, subchondral sclerosis, and loss of joint space.  Id.  Petitioner considered knee replacement, but was right then interested in pursuing guitar lessons and would have knee replacement surgery either later in 2011 or in the first quarter of 2012.  Id.

On October 7, 2011, petitioner saw Dr. Katarina E. Lanner-Cusin,[6] her gynecologist, telling her she was very anxious that she may have a breast lump.  Med. recs. Ex. 76, at 319.  She noticed something in her left breast.  She had not had a mammogram in some time.  Dr. Lanner-Cusin notes petitioner was very anxious and was "wondering [when the other] shoe will drop." Id.  Dr. Lanner-Cusin did a breast examination which was normal.  She referred her to Dr. Bailey's office for an additional examination.  Id.

---

[6] Dr. Katarina Lanner-Cusin is an obstetrician-gynecologist who received her medical degree from the University of California San Francisco School of Medicine.  Dr. Katarina Lanner-Cusin, U.S. NEWS, https://health.usnews.com/doctors/katarina-lanner-cusin-513717 (last visited March 5, 2018).

On December 12, 2011, petitioner received a flu vaccination.  Med. recs. Ex. 4, at 3.

On December 13, 2011, Dr. Nina R. Birnbaum,[7] petitioner's personal care physician ("PCP") at the time, wrote petitioner that her cholesterol was very slightly high but it was nothing to worry about.  Med. recs. Ex. 76, at 238.  Dr. Birnbaum suggested petitioner eat a tiny bit less fat to bring her LDL below 130 but she did not want petitioner "to worry terribly about it."  Id.

On December 15, 2011, petitioner saw Dr. Birnbaum for her annual visit.  Med. recs. Ex. 76, at 400.  Petitioner took Clonazepam[8] every night and sometimes used Valerian instead but only when she thought of it.  She also woke in the middle of the night and took additional medication.  Id.

On February 21, 2012, petitioner went to Dr. Mehra Hosseini for a colonoscopy.  Id. at 207.  Dr. Hosseini found internal hemorrhoids which were moderate.  Id.  Petitioner had more frequent bowel movements, which Dr. Hosseini wrote could be related to diet or irritable bowel syndrome microscopic colitis.  Id. at 208.

On May 16, 2012, petitioner saw Dr. Birnbaum, who diagnosed petitioner with thoracic outlet syndrome[9] likely due to repetitive injury from extensive guitar playing.  Med. recs. Ex. 76, at 399.  Petitioner needed advice on positioning her body during guitar playing and she needed a home exercise program.  Id.  Petitioner had gone to John Muir Hospital Emergency Room by ambulance in the middle of the night because of abdominal pain.  Id. at 397.  She was sent home without a diagnosis.  The doctor on call thought it might be pleuritic inflammation of the chest wall.  Petitioner thought it might be related to playing the guitar.  She was worried because she had a concert that weekend and spent three hours a day playing the guitar.  She had been working on her right arm position, but not the left.  Petitioner had musculoskeletal tenderness in the posterior axilla and pectoralis attachment bilaterally on physical examination.  Id.

---

[7] Dr. Nina Birnbaum is a family medicine doctor who received her medical degree from Columbia University College of Physicians and Surgeons.  Dr. Nina Birnbaum, U.S. NEWS, https://health.usnews.com/doctors/nina-birnbaum-851081 (last visited March 5, 2018).

[8] Clonazepam is "an antipanic agent used in the treatment of panic disorders."  Dorland's at 373.  Clonazepam is also known as Klonopin and belongs to the drug class benzodiazepine.  www.rxlist.com/klonopin--drug/patient-images-side-effects.htm  (last visited March 19, 2018).  It is prescribed for the treatment of anxiety and seizure disorders.  Common side effects are: drowsiness, dizziness, weakness, unsteadiness, depression, loss of orientation, headache, sleep disturbances, problems with thinking or memory, slurred speech, dry mouth, sore gums, runny nose, loss of appetite, diarrhea, constipation, and blurred vision.  Id.  Drug interactions include alcohol, barbiturates, and narcotics.  Id.

[9] Thoracic outlet syndrome is "any of a variety of neurovascular syndromes resulting from compression of the subclavian artery, the brachial plexus nerve trunks, or less often the axillary vein or subclavian vein, by thoracic outlet abnormalities such as a drooping shoulder girdle, a cervical rib or fibrous band, an abnormal first rib, or occasionally compression of the edge of the scalenus anterior muscle.  Continual hyperabduction of the arm may cause another variety *(hyperabduction s.)*. . . .  Nerve compression causes atrophy and weakness of the muscles of the hand and, in advanced cases, of the forearm, with pain and sensory disturbances in the arm."  Dorland's at 1850.

On August 27, 2012, petitioner saw Dr. Noah N. Niufar for a preoperative examination for her cataract surgery the following Wednesday with Dr. Sorenson.  Med. recs. Ex. 76, at 392. Petitioner was also interested in receiving vaccines.  Id.  Petitioner was to have received pneumococcal vaccine, but Dr. Nufar cancelled it.  Id. at 395.

## Postvaccination Records

On September 11, 2012, petitioner received flu vaccine in her left deltoid and Pneumovax 23 vaccine at a CVS in Raleigh-Durham, NC, where petitioner had gone for weight reduction at Rice House in Durham, NC.  Med. recs. Ex. 1, at 2; Ex. 14, at 2, 4.  The pharmacist who administered the vaccines to petitioner was Hemal Modi, RpH ("Registered Pharmacist").[10] Med. recs. Ex. 14, at 2.

Also on September 11, 2012, Dr. Neelon did an examination of petitioner, noting her problems were right knee pain, abdominal discomfort, chest pain, hypothyroidism, and osteopenia.  Med. recs. Ex. 2, at 15.  Petitioner was taking Clonazepam, Levoxyl, and rarely Zolpidem.  Her family history was positive for cancer and emphysema.  She had a partial thyroidectomy in 2000 and knee surgery in the 1990s.  Dr. Vail in San Francisco recommended petitioner have knee replacement surgery.  Id.

On September 12, 2012, Dr. Neelon's nurse (identified only by the initials KB) noted petitioner felt tired, achy, and feverish.  Petitioner had a low-grade temperature of 99.5 degrees. She had redness and tenderness at (and then the rest of the note is not reproduced).  Med. recs. Ex. 2, at 3.  On September 18, 2012, petitioner's white blood cell count was 11.6 (normal being between 3.8-10.8).  Med. recs. Ex. 2, at 6, 12.

On September 24, 2012, Dr. Neelon wrote petitioner a letter, and handwrote a note saying petitioner's blood tests showed a somewhat high cholesterol.  Id. at 10.  Dr. Neelon also wrote that petitioner's white blood count was up a little, probably a reflection of her viral illness.  Id.

On November 12, 2012, in preparation for her annual visit to her gynecologist, Dr. Lanner-Cusin, petitioner filled out a questionnaire.  Med. recs. Ex. 75, at 2.  Petitioner noted she has osteoporosis in her spine.  Under question 12: "Have you had any significant medical problems or surgeries over the last year?" petitioner answered yes; she had cataract surgery with excellent results.  Petitioner did not mention right shoulder pain.  Id.  On the second page of the questionnaire is the question whether petitioner had significant muscle or joint pain.  Id. at 3. Petitioner answered she had right knee pain.  Id.  She did not mention she had right shoulder pain on this questionnaire.  This was two months after petitioner's September 11, 2012 vaccinations.

---

[10] Hemal Modi has a bachelor's degree in pharmacy and a master's degree in pharmacy.  Hemal Modi, ROCKETREACH, https://rocketreach.co/hemal-modi-email_41440267 (last visited: Feb. 28, 2018).  He is pharmacy manager at CVS Caremark Corporation.  Hemal Modi, LINKEDIN, https://linkedin.com/in/hemal-modi-55a814125 (last visited Feb. 28, 2018).  He has been registered as a pharmacist in NC since September 19, 2007 and has never been the subject of disciplinary proceedings.  License Verification, NORTH CAROLINA BOARD OF PHARMACY, https://portal.ncbop.org/Verification/resultList.aspx (last visited Feb. 28, 2018).

Also, on November 12, 2012, petitioner saw Dr. Lanner-Cusin for her annual visit. Med. recs. Ex. 4, at 34. Dr. Lanner-Cusin discussed with petitioner her aging skin, atrophic vaginitis, and osteoporosis. Id. Petitioner gave Dr. Lanner-Cusin the wrong date for her flu vaccination, i.e., October 1, 2012, instead of the correct date, September 11, 2012. Id. at 35. Petitioner did not tell Dr. Lanner-Cusin that she had received Pneumovax vaccine. Thus, the Sutter East Bay record reflects that she was overdue to receive Pneumovax vaccine. Dr. Lanner-Cusin reviewed a full 14-point review of petitioner's systems, including her musculoskeletal system, which petitioner completed. Id. at 36. Petitioner's review of systems was negative except for petitioner having hearing problems, chest pain once (which was investigated), and right knee pain. Dr. Lanner-Cusin noted that petitioner loved playing the guitar. Id. Two months after petitioner's September 11, 2012 flu vaccination, petitioner did not complain to Dr. Lanner-Cusin about right shoulder pain and petitioner did not indicate in the review of systems that petitioner completed and Dr. Lanner-Cusin reviewed that she had any joint that was painful except for her right knee.

On December 17, 2012, one month after her annual visit to Dr. Lanner-Cusin, petitioner had her annual visit with Dr. Birnbaum. Id. at 23. She told Dr. Birnbaum that she had gone to the Rice Clinic in Durham, NC, for weight loss. Id. at 28. Petitioner discussed with Dr. Birnbaum that she was trying to lose weight and she wanted to lose 10 more pounds, but was losing weight very slowly and was concerned about the appearance of her skin. Id. Petitioner also discussed her recent cataract surgery, her significant hearing loss, her need for gum surgery, the osteoarthritis[11] of her right knee, and her having surgery for Graves disease[12] because she did not want to take radioactive iodine to treat her thyroid condition. Dr. Birnbaum diagnosed petitioner with hypothyroidism, decreased libido, and osteoporosis. Id. Dr. Birnbaum asked petitioner the following questions to which petitioner gave the following answers:

Depression screen:
1. Over the past 2 weeks, has the patient felt down, depressed or hopeless? No.
2. Over the past 2 weeks, has the patient felt little interest or pleasure in doing things: No. "In fact she loves playing the guitar and singing and has been performing at open mikes, etc."

Functional Evaluation:

| 1.   Does the patient need help with | bathing? | no |
|---|---|---|
| | telephone use? | no |
| | transportation? | no |
| | shopping? | no |

---

[11] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity. Called also *degenerative arthritis*, *hypertrophic arthritis*, and *degenerative joint disease*." Dorland's at 1344.

[12] Graves disease is "a syndrome of diffuse hyperplasia of the thyroid, with a female predominance; it usually has an autoimmune etiology and has been linked to autoimmune thyroiditis." Dorland's at 534.

| | preparing meals? | no |
|---|---|---|
| | housework? | no |
| | laundry? | no |
| | Medications? | no |
| | Managing money? | no |
| 2.   Does the patient's home have | Throw rugs? | no |
| | poor lighting? | no |
| 3.   Does the patient's home have | grab bars in the bathroom? | no |
| | handrails on the stairs? | yes |
| 4.   Does the patient live alone? | Husband and dog | no |

This was three months after her flu vaccination, but petitioner still did not complain to Dr. Birnbaum about having right shoulder pain or any difficulty performing activities of daily living.

On December 19, 2012, Dr. Richard J. Brenner performed a mammogram on petitioner. Med. recs. Ex. 76, at 112.  She had a history of breast augmentation mammoplasty in 1960 and of implant revision in 1970 (removal).  Dr. Brenner did not see any significant abnormality on the mammogram.  Id.

On March 8, 2013, petitioner called nurse Janis Huber and said she noticed a small lump on her left forearm on the palm side that had increased slightly in size. Ex. 74, at 70.  Originally, petitioner thought the lump was located in a vein, but now reported it was a quarter of an inch from her vein.  The lump was approximately the size of a pencil eraser.  She said it was not discolored and did not have streaks radiating from it.  Petitioner stated it was not interfering with activity and she continued to play the guitar as normal.  She did not report any other concerns.  She stated she needed a blood draw for a thyroid test (TSH), and was advised to call the first thing on Monday morning at 7:00 to schedule one.  Petitioner thanked Nurse Huber and hung up. Id.  Six months after flu vaccination, petitioner did not complain about right shoulder pain even though she complained of a lump on her arm that was painless and did not interfere with her normal guitar playing.

On March 27, 2013, petitioner saw Dr. Birnbaum, complaining about this same lump on her left arm. Med. recs. Ex. 4, at 24.  Dr. Birnbaum's assessment was that the lumps in the veins in petitioner's arms were almost certainly the result of her recent sclerotherapy[13] for enlarged veins in her arms and she should discuss them with the surgeon.  Id.  Also on March 27, 2013, petitioner had sun-damaged skin. Med. recs. Ex. 76, at 376.  She wanted a topical retinoid for wrinkles.  Id.  Six months after flu vaccination, petitioner sought assistance from her PCP Dr. Birnbaum for a painless lump on her arm and for wrinkles, but not for a painful right shoulder.

On July 3, 2013, petitioner saw Dr. Michael H. Lewis, whom she designated her new PCP.[14]  Med. recs. Ex. 76, at 29.  Petitioner was there for prescription refills of ongoing

---

[13] Sclerotherapy is "the injection of a chemical irritant . . . into a vein to produce inflammation and eventual fibrosis and obliteration of the lumen, as for the treatment of . . . varicose veins . . . ." Dorland's at 1681.

[14] Dr. Lewis had previously been petitioner's PCP by February 25, 2009, when she identified him as her PCP on a

medications.  Id. at 30.  Petitioner was under the care of Dr. Nina Birnbaum but transferred to Dr. Michael Lewis "now for unclear reasons (didn't want to discuss today).  Denies other complaints."  Id.  She reported she had a colonoscopy with Dr. Hosseini about two years before which was not yet confirmed and had a mammogram within the past year and one-half (also not confirmed).  Dr. Lewis did not have any available records at this time.  Id.  Petitioner denied she had any sensory change in a review of systems ("ROS").  Dr. Lewis diagnosed her with unspecified hypothyroidism and menopause.  He prescribed Synthroid, vaginal Estring, and female testosterone cream.  Id.  Nine months after flu vaccination, petitioner did not complain about right shoulder pain and denied any other complaints than the ones he wrote down.

On August 12, 2013, petitioner saw Dr. Lanner-Cusin and complained about painful intercourse.  Med. recs. Ex. 4, at 21.  Dr. Lanner-Cusin diagnosed petitioner with postmenopausal atrophic vaginitis and decreased libido.  Id. at 22.  Petitioner wanted Dr. Birnbaum to write her a prescription for a topical retinoid for wrinkles.  Id.  Eleven months after vaccination, petitioner did not complain about right shoulder pain.

On September 19, 2013, petitioner saw Dr. Lewis.  Med. recs. Ex. 76, at 27.  Petitioner complained of right shoulder, right arm, right thumb, and knee pain which she related to guitar playing.  Id. at 28.  Her right knee had degenerative joint disease, reported as bone on bone.  She had chronic insomnia and had habitually used Clonazepam to sleep.  She admitted watching television before sleep and often ate late.  Dr. Lewis discussed sleep hygiene with petitioner and changes she could make to improve the chances of her getting better sleep.  Petitioner did not seem interested in changing her routine.  Id.  Petitioner's gynecologist Dr. Lanner-Cusin said petitioner received immunizations at Duke University in 2012 and had a colonoscopy within the past two years which was normal.  Id.  Dr. Lewis did a physical examination on petitioner and found that her joints had grossly normal range of motion in all extremities.  Id.  Her knee examination was completely normal.  Her state of mind was anxious.  Id.

On October 10, 2013, petitioner saw Dr. Lewis.  Med. recs. Ex. 76, at 25.  Petitioner complained of persistent right knee pain after a twist injury.  Id. at 26.  She had bilateral knee pain and was told she has bone on bone arthritis in her right knee.  Id.  She had reservations about total knee replacement.  Dr. Lewis made an orthopedic referral to Dr. Strotz, asking Dr. Strotz to see petitioner for severe degenerative joint disease who was open to less than complete knee replacement, and whom Dr. Tom Vail at UCSF was advising.  Id.

On October 16, 2013, petitioner received a flu vaccination in her left deltoid at Walgreen's.  Med. recs. Ex. 39, at 1.  She signed the informed consent form and answered various questions on the form, including question 5: "Have you ever had a serious reaction to an

---

Sutter Health questionnaire dated February 25, 2009.  Med. recs. Ex. 75, at 6.  In petitioner's questionnaire dated May 10, 2010, she identified Dr. Kate Westbrook as her PCP.  Id. at 4.  By November 12, 2012, petitioner identified Dr. Birnbaum as her PCP in a questionnaire dated November 12, 2012.  Id. at 2.  Only on July 3, 2013, did petitioner seek out Dr. Lewis to become her PCP again.  In her March 2, 2017 questionnaire petitioner filled out for Sutter Health, she listed Dr. Margaret Kirkham as her PCP.  Id. at 1.  Thus, petitioner has had four doctors as her PCP at various times between 2009 and 2017 at Sutter Health.

influenza vaccine or any other vaccine in the past?" with the answer: "no reaction, sick" and then a question mark.  Id.  In addition, she answered question 7: "Are you 65 years of age or older?" with the answer "X" under the "no" column, although she was 73 years old in 2013.  Id.

On November 1, 2013, petitioner was noted to have a high white blood cell count of 18.6 when the normal range was 4.8-10.8.  Med. recs. Ex. 4, at 75.  This is considerably higher than the white blood cell count of 11.6 recorded on September 18, 2012 when Dr. Neelon diagnosed petitioner with a viral infection after she had received flu and Pneumovax vaccinations.

On November 1, 2013, petitioner saw Dr. Natalie A. Marshall, an oncologist, as a new patient.  Med. recs. Ex. 76, at 119.  Dr. Lewis noted on petitioner's routine blood work that she had a leukocytosis consisting of lymphocytes.  She did not have any constitutional symptoms such as fever, chills, night sweats, or involuntary weight loss.  She felt fine except for right knee arthritis.  She had a history of Graves disease and had a partial thyroidectomy.  She took thyroid replacement therapy.  Id.  For past medical history, Dr. Marshall listed hypothyroidism, Graves disease, arthritis, osteoporosis, and insomnia.  Id. at 120.  In Dr. Marshall's review of systems, she wrote stiffness in neck and right knee pain due to arthritis.  Id.

On November 15, 2013, a fluorescence in situ hybridization ("FISH") analysis was performed using DNA probes for the CLL profile whose results were issued November 18, 2013.  Id. at 89.  It showed a monoallelic deletion of chromosome 13q14.3 gene region.  Id.

On November 15, 2013, petitioner saw Dr. Marshall again to discuss the results of a flow cytometry that confirmed she has CLL.  Id. at 86.  Petitioner wanted a second opinion.  She did not want to have a CT scan of her body because of worry about radiation exposure.  Id.  On a review of systems, petitioner had knee pain from arthritis.  Id. at 87.  Petitioner had normal upper and lower extremity strength.  Id.  There is no mention of any right shoulder pain.  This is one year, three months after her flu vaccination.

On November 25, 2013, petitioner saw Dr. Michael H. Lewis.  Id. at 29.  Petitioner was recently diagnosed with CLL and had reportedly favorable markers.  She wanted to see UCSF specialist Dr. Lloyd Damon.  She had a lot of anxiety regarding CLL.  Dr. Lewis wrote a hematology-oncology referral to Dr. Lloyd Damon, noting petitioner felt well.  Id. at 24.

On November 27, 2013, petitioner was noted to have a high white blood cell count of 17.6 when the normal range was 4.0-11.0.  Med. recs. Ex. 4, at 55.

On December 16, 2013, petitioner filled out a questionnaire for the University of California San Francisco ("UCSF") Medical Center.  Med. recs. Ex. 9, at 27.  She had been smoking three packs a day for eight years when she quit smoking 25 years before.  She was a recovered alcoholic and had been sober for 11 years.  She described herself as a passionate musician who wanted to continue singing, songwriting, and playing guitar always.  Her concern was whether her sons and grandchildren were at risk for chronic lymphocytic leukemia ("CLL").  Id.  She indicated she had intermittent numbness or tingling sensations in her hands at night in

bed.  Id. at 29.  As for change in memory or concentration, she said she had occasional "senior moments."  Id.  For musculoskeletal, she noted she needed right knee replacement and she had shoulder tension.  Id.  Dr. Damon told petitioner that her CLL had an overall favorable prognostic feature and he expected her CLL to be indolent and her prognosis to be very good in the range of years.  Id. at 82.  At that time, there was no indication for treatment.  She should come back every three months for the next six months.  He recommended an annual flu vaccination (which she received in 2013), Pneumovax (which she received in 2012), HiB, Dtap, and shingles vaccine.  He concluded her prognosis was excellent with a median survival of 11 years.  There were no indications for therapy at that time.  He told petitioner that her immune system will deteriorate over time and now was the best time to update her vaccinations.  He spent 65 minutes with petitioner, 45 of which were spent in counseling, the treatment plan, and the prognosis.  Id.

On December 16, 2013, petitioner saw Dr. Lloyd E. Damon for a new diagnosis of CLL. Med. recs. Ex. 76, at 80.  Petitioner came for a second opinion of her B cell chronic lymphocytic leukemia with 13q deletion made in November 2013 by flow cytometry after presenting with lymphocytosis.  She was diagnosed in November 2013 after a routine blood draw by Dr. Lewis, her PCP, for cholesterol.  Her initial CBC with differential showed a WBC of 18.6L.  Petitioner felt overall well, but had a lot of anxiety over her recent diagnosis of CLL.  She had slight fatigue but was very active exercising one hour daily.  She had not recent illnesses.  She was interested in counseling and alternative therapies (integration of yoga, acupuncture, diet) for her disease.  Petitioner was a former smoker and current sex therapist.  Id.  On review of systems, she had mild fatigue and anxiety.  Her musculoskeletal ROS was negative.  She had some mild numbness of her hands at night.  Id.

On December 27, 2013, petitioner saw Dr. Louise E. Nurre.  Id. at 21.  Petitioner refused to be weighed.  Id.  Petitioner came in to get "any preventive things done prior to the end of the year.  Id. at 22.  Dr. Nurre noted that petitioner understood she needed to schedule with her PCP for this.  Dr. Nurre and petitioner "reviewed her most pressing requests."  Id.  She was diagnosed with CLL and was very worried about it.  She wanted a referral for a hematologist-oncologist who would take the time to talk with her and tell her how to avoid having any treatment.  Dr. Nurre referred her to Dr. Wexler.  Dr. Nurre and petitioner discussed the importance of eating well and of daily exercise.  Petitioner played the guitar and had a several year problem with mobility in her right shoulder "stemming from she does not know what."  Id.  Fairly recently, she fell off a low stool onto her right shoulder and her right shoulder had hurt since then.  She did not have numbness or weakness.  It hurt when she played the guitar and when she was trying to sleep.  Id.  On physical examination, petitioner had mild tenderness of her posterior shoulder. Her range of motion in all planes was only about 60% of normal.  She had minimal pain with range of motion.  Id.  Dr. Nurre diagnosed petitioner with impingement syndrome of the shoulder region, CLL, and osteoarthritis of the knee.  She referred her to physical therapy for the right shoulder and her knees, and encouraged her to do water walking for her knees.  Id.

Petitioner had a prescription for Clonazepam and wondered if Dr. Nurre could write out multiple refills so petitioner did not have to keep asking for a new prescription.  Dr. Nurre asked

petitioner to discuss this with her PCP.  Petitioner also wondered about her knees which hurt intermittently and sometimes swelled.  Id.  Petitioner told Dr. Nurre that she had a flu vaccination on October 16, 2013, but did not tell Dr. Nurre that she had a prior flu vaccination on September 11, 2012 or that the flu vaccination in 2012 caused her right shoulder pain.  She told Dr. Nurre that she received pneumococcal vaccine on September 19, 2012, which was not the actual date which was September 11, 2012.  Id. at 23.  This is one year three and one-half months after receiving the 2012 flu vaccination, but petitioner had no memory that she had any reaction to it or to Pneumovax vaccination.

Also on December 27, 2013, because of concern that petitioner had fractured her right shoulder after falling on it, petitioner had an x-ray done of her right shoulder.  Med. recs. Ex. 4, at 103.  The history was status post fall, shoulder pain.  Dr. Richard Hong interpreted the x-ray as showing marked degenerative changes evidenced by large inferomedial humeral head osteophyte[15] formation.  He noted petitioner's acromioclavicular joint alignment was within normal limits.  He also noted small undersurface acromioclavicular joint osteophytes.  A horizontal lucency measuring about 11 mm was present along the superior aspect of the glenoid.  This lucency had somewhat smooth, regular margins.  Dr. Hong wrote the etiology was unclear.  Given the history of petitioner's recent fall, Dr. Hong stated he could not entirely rule out that petitioner had a nondisplaced glenoid fracture of her right shoulder.  Id.

On January 6, 2014, petitioner went to Pinole Physical Therapy Clinic on recommendation of Dr. Louise Nurre, for pain in her right shoulder joint.  Med. recs. Ex. 13, at 3.  Patient gave a history that she injured her right shoulder when she fell off a small table.  Id.  Her symptoms were limited range of motion of her right shoulder and limited overhead reaching activity.  Id.  Petitioner reported the pain was located in the anterior shoulder.  The date of her injury was December 8, 2013.  Id.  Petitioner said that recent x-rays of her right shoulder showed osteoporosis and osteoarthritis.  She is right hand dominant.  For range of motion of her right shoulder, she had flexion of 80%, and internal and external rotation of 75% of normal.  She had shoulder and arm strength of 4+ out of 5 grade.  On palpation, she had mild tenderness of her right anterior shoulder and acromioclavicular ("AC") joint.  Id.  The assessment was that petitioner reported limited overhead reaching.  Recent x-rays reportedly showed mild osteoarthritis of the shoulder.  She had moderate limitation of her right shoulder rotation movements.  She had good shoulder strength and anterior right shoulder tenderness.  The treatment plan was once a week for four weeks she would have therapeutic activities, exercise of range of motion, strengthening and home exercise program ("HEP").  Id.

On January 21, 2014, petitioner saw Dr. Brad Zwahlen, an orthopedist, who wrote that petitioner fell three weeks previously and then fell a second time on her right shoulder just the prior night, i.e., January 20, 2014.  Med. recs. Ex. 76, at 77.  Dr. Zwahlen had x-rays taken that afternoon.  They did not show any fracture, but they did show significant glenohumeral arthrosis, bone-on-bone arthritis, and glenohumeral arthritis.  Petitioner had had decreased range of motion for a couple of years, but it was worse since her fall three weeks ago.  On physical examination, petitioner had normal strength within her decreased range of motion.  She had minimal external

---

[15] An osteophyte is "a bony excrescence or osseous outgrowth."  Dorland's at 1348.

rotation.  Id.  Petitioner had significant chronic arthritis in her right shoulder, which her fall likely further exacerbated, but the arthritis preceded the fall.  Id.

On February 27, 2014, petitioner and her husband saw Dr. Michael H. Lewis.  Med. recs. Ex. 76, at 18, 19.  Petitioner was anxious and upset regarding her diagnosis of CLL.  Id. at 19.  They had both been to the local oncologist Natalie Marshall and also to UCSF.  Petitioner ruminated about finding more information about her illness and treatment for it beyond what her oncologists already explained to her which is the fact that there was nothing to do at this stage of her CLL except to follow her white blood count levels.  Dr. Lewis notes, "Her anxiety and inability to accept her status has impaired her ability to sleep and has caused her much daytime anxiety.  She requests a refill of her Clonazepam.  She wonders if she should see someone at Stanford."  Id.  Dr. Lewis writes in the Assessment portion of his record: "Anxiety, insomnia and rumination about CLL.  Counselling and support provided.  Discussed meditation and relaxation as interventions (disciplines she has practiced and taught for years) and to remember that she is NOT her disease, as a useful reminder to pull back from self[-]enveloping anxiety."  Id.  Petitioner still wanted to see another oncologist and was all right using a local one.  Dr. Lewis send her to Ann Wexler.  Id.  Petitioner was scheduled to see a provider at the Integrative Medicine faculty of UCSF in the next few weeks.  Id. at 20.  Dr. Lewis diagnosed petitioner with anxiety about body function or health and with CLL.  He wrote a note to Dr. Ann Wexler: "Dear Ann, Please see this 74 y[ear] o[ld] spiritualist and PhD psyc[h]otherapist who has requested (3rd) Opinion re her recently diagnosed CLL."  Id.

On March 5, 2014, petitioner saw Dr. Sanjay Reddy, who noted her recent diagnosis of CLL, which was stage zero, with overall excellent prognosis.  Med. recs. Ex. 9, at 1.  She recently had two episodes of upper respiratory illness which made her anxious that it was short-term CLL.  She had a great deal of anxiety/stress related to her diagnosis and reported it helped her appreciate life more now.  Petitioner noted her right knee was often painful and she had considered total knee replacement.  She also reported right shoulder pain and decreased range of movement for years.  She noticed her balance had worsened a little bit and she occasionally tripped over things.  Dr. Reddy noted petitioner's past medical history of hypothyroidism, osteoarthritis, and CLL.  Id.  On physical examination, petitioner moved all four extremities.  Id. at 2.  Petitioner asked Dr. Reddy for options to help her energy levels and CLL.  Id. at 2-3.  Dr. Reddy noted, "From her discussion of CLL, she may not have the best understanding of the difference between CLL and other malignancies, as she repeatedly mentioned how being diagnosed with cancer changed her outlook on life, made her appreciate her life more, has helped her understand other people with cancer, etc."  Id. at 3.

On April 7, 2014, petitioner saw Dr. Lloyd E. Damon to follow up for her CLL.  Id. at 3.  Her height was 5'5" and her weight was 318 lb 9 oz.  Id. at 4.  Petitioner received Zostavax (shingles vaccine).  Id. at 5.

On June 14, 2014, petitioner was noted to have a markedly high white blood count.  Med. recs. Ex. 4, at 49-50.  It was 20.4 when the normal range was 4.0-11.0.  Id. at 50.

14

On June 16, 2014, petitioner saw Dr. Lewis.  Med. recs. Ex. 76, at 15.  Petitioner had a recent diagnosis of CLL.  She complained of reduced right shoulder abduction.  She did not have a recent injury but travelled a lot recently.  Id. at 16.  On physical examination, she had mild restricted abduction of her right shoulder compared to her left shoulder.  Id.  Dr. Lewis diagnosed petitioner with adhesive capsulitis of her shoulder or right frozen shoulder.  Id. at 17.  Petitioner received Tdap vaccine in her left upper arm that day.  Id. at 17, 450.

On June 20, 2014, petitioner left a message on the portal to reach Dr. Lewis regarding Clonazepam.  Id. at 464.  She wanted at least four or more refills in place on her Clonazepam prescription.  She states she has been taking "this benign medication" almost nightly for at least five years and it was difficult for her to arrange for the pharmacist to call Dr. Lewis's office every time she ran out.  The pharmacist's current instructions were not to refill the prescription in less than 30 days, even if petitioner paid for it out of pocket.  She wanted more flexibility as she used to have when Dr. Neelon from Duke was prescribing it.  Id.

On July 25, 2014, petitioner left a message on the portal to reach Dr. Lewis regarding Clonazepam.  Id. at 464.  Petitioner wanted Dr. Lewis to call into the pharmacy a larger prescription of Clonazepam with more refills.  She states it is a benign medication that poses no danger.  She found a monthly refill inconvenient because the prescription was too small and the refills too tightly controlled and too few.  Id.

On August 1, 2014, petitioner saw Dr. Lanner-Cusin complaining of a lump in her breast that she detected two weeks earlier.  Id. at 368.  Dr. Lanner-Cusin did a breast examination and found a 0.5 x 0.5 cm mass in the right breast which was superficial in the dermis or subcutaneous which might be a lymph node or a sebaceous cyst.  She referred petitioner to having a diagnostic bilateral mammogram and right breast ultrasound.  Petitioner told her she was seeing Dr. Lloyd Damon at UCSF for her CLL, which she had researched very extensively.  She was pleased with Dr. Damon, but was considering care in the East Bay, for which a referral was given.  Id.

On August 20, 2014, petitioner had a bilateral mammogram, which was normal, and an ultrasound, which was also normal.  Id. at 372-73.

On March 10, 2015, petitioner saw Dr. Birnbaum and told her that she had had a frozen right shoulder for some time.  Med. recs. Ex. 4, at 12.  Petitioner "now" thought it might have been from getting flu and Pneumovax vaccinations together in 2012.  She could not raise her arm much above 90 degrees and had pain sleeping on it.  She went to physical therapy for one session.  Petitioner said she did play guitar a lot.  Id.  In addition, petitioner complained to Dr. Birnbaum about insomnia and diarrhea.  Med. recs. Ex. 76, at 364.  She presented with lymph node swelling.  Petitioner told Dr. Birnbaum she was withdrawing from Clonazepam.  She had been coming off it very slowly.  Now in the last week, she had been out of it completely and was not able to sleep.  Petitioner was concerned about the elevated risk of Alzheimers disease.  She had been substituting valerian and melatonin.  She usually slept for several hours and then was awake for several hours.  Then she got a couple more hours of sleep.  She also had Ambien but said she took it only every few months.  Petitioner complained about bouts of diarrhea but did

15

not remember exactly when it started, although she thought it was about a year ago.  She used the toilet about six times a day.  This is the first medical record since petitioner's September 11, 2012 flu vaccination in which she connected her right shoulder pain to vaccination, although she did not specify in which arm she received flu vaccine and which arm she received Pneumovax vaccine.  Two-and-one-half years elapsed between her 2012 vaccinations and petitioner's history that she might have had a reaction to flu vaccine and Pneumovax vaccine.

On May 12, 2015, petitioner had a colonoscopy done and polyps analyzed, which were benign.  Med. recs. Ex. 76, at 129.  She had clinically significant diarrhea of unexplained origin.  Id.

On July 23, 2015, petitioner saw Dr. Michael H. Lewis.  Id. at 12.  Petitioner had a growth on the right side of her neck which she worried might be a melanoma.  Id. at 13.  She had stopped taking Clonazepam for insomnia and now took Benadryl.  She said she was grateful for having CLL because now she appreciated her life much more.  She had chronic right shoulder pain and reduced range of movement.  She had chronic right knee pain.  Id.  On physical examination, her left knee was normal.  Id.  She was anxious on physical examination.  The growth on the right side of her neck was a cyst.  Id.  Petitioner reported she had an appointment with UCSF sleep center.  Id. at 14.

On August 24, 2015, petitioner filed her petition pro se.  From that point on, petitioner consistently gave a history to various doctors that her right shoulder pain began after a 2012 flu vaccination.

On August 30, 2015, petitioner went to John Muir Health Walnut Creek Hospital Emergency Department where Dr. David Wei wrote that petitioner complained of right knee pain which was chronic but, over the prior two days, had been worse.  She said the pain was on the medial aspect of the leg and radiated downward into the front of her shin, mainly when she attempted to walk.  Med. recs. Ex. 76, at 72.  Dr. Wei found a Baker's cyst on the right.  Id. at 76.

On September 3, 2015, petitioner saw Dr. Charles Strotz, a knee specialist.  Id. at 69.  Petitioner told Dr. Strotz that she was aware of pain in her right knee and proximal calf for about five days.  She did have a history of ongoing knee pain.  Twenty years ago, she had a torn lateral meniscus for which she had arthroscopic surgery and, since then, she developed intermittent pain in her knee.  She also had CLL.  X-rays showed lateral patellofemoral degenerative change with bone on bone contact.  His impression was that petitioner had unilateral primary osteoarthritis of her right knee.  She was not interested in joint replacement surgery at that time.  Id.

On September 8, 2015, petitioner saw Dr. Reddy.  Med. recs. Ex. 9, at 6.  Petitioner said she woke up Sunday morning with right leg pain and inability to walk.  She felt fine on Saturday night.  She went to John Muir woods.  She had been having problems with sleep and stopped regular use of taking Klonopin three months ago, and had been having difficulty sleeping since.  She took Klonopin last night but had not been taking it two nights in a row.  She started taking

Klonopin in order to stop taking Ambien.  She occasionally took Ambien now.  She wanted to know what she can do to help with her CLL.  Id.  On physical examination, petitioner did not have any tenderness, weakness, or laxity on her joint exam of her lower extremities.  There were no focal findings.  She moved all four extremities.  Id.  Dr. Reddy counseled petitioner on how CLL differs from other forms of cancer and has an excellent prognosis.  He did acupuncture.  Id.

On September 15, 2015, petitioner saw Dr. Radhika A. Ramanan.  Id. at 10.  She had been taking Klonopin every night for over 10 years.  She discontinued completely in mid-July and then had worsened insomnia.  She was now taking intermittently Ambien and clonazepam.  An endocrinologist at Duke, Dr. Francis Neelon, had prescribed Clonazepam in 2005.  She started taking Ambien around 2003.  She said she never slept unless she took something.  Id.  Petitioner's CLL was diagnosed in 2013 from a routine lab test from her PCP.  Id. at 11.  Dr. Ramanan wrote petitioner had a history of frozen shoulder with limited mobility.  Id. at 15.  Dr. Ramanan referred petitioner to physical therapy.  Id. at 15.

On October 19, 2015, petitioner saw Dr. Lloyd E. Damon who wrote petitioner had normal strength and no joint pains, but had a right frozen shoulder which occurred after a vaccination in the past.  Id. at 20.  Petitioner received a flu vaccination.  Id. at 22.  She was to receive Prevnar at the next visit.  Id.

On November 11, 2015, petitioner saw Dr. Nurre who filled out a physiatry referral form stating that petitioner had impingement syndrome of her right shoulder and arthritis on x-ray done by Dr. Zwahlen.  Med. recs. Ex. 8, at 1.  Dr. Nurre wrote petitioner's symptom onset was after a flu vaccination in 2012.  Id.  Dr. Nurre noted that petitioner's left shoulder was not painful, but had a mildly decreased range of motion in all planes.  Med. recs. Ex. 76, at 10.  Dr. Nurre noted in her conversation with petitioner, "She understands she has arthritis, but really thinks the arm was not a problem until she had the flu shot.  She plans to file with the vaccine compensation program."  Id.  Dr. Nurre diagnosed petitioner with impingement syndrome of right shoulder, noting she had considerable impingement and arthritis on x-ray, adhesive capsulitis of the right shoulder, and degenerative joint disease of the shoulder region.  Id. at 11.  Dr. Nurre encouraged petitioner to continue with physical therapy because her right shoulder's range of motion was so poor and her left shoulder had mildly decreased range of motion as well.  Id.  Dr. Nurre also notes, "She contends that her pain appeared after her flu shot, and I can't prof[f]er a rationale for this. . . .  I think her arthritis is quite significant . . . ."  Id.

Also on November 11, 2015, petitioner saw Dr. Michael H. Lewis, who prescribed physical therapy for her right shoulder.  Med. recs. Ex. 7, at 1.  Dr. Lewis's prescription states "Physical Therapy R > L [right greater than left] shoulder impingement, ® [right] shoulder pain significant R shoulder arthritis."  Id.

Also on November 11, 2015, petitioner saw Dr. Mark H. Chan who diagnosed her with right shoulder impingement syndrome and noted her onset was after a flu vaccination in 2012.  Med. recs. at Ex. 8, at 1.

17

On January 19, 2016, petitioner saw Dr. Michael H. Lewis.  Med. recs. Ex. 76, at 7.  Her history included: CLL, hypothyroidism, neutrophilia, anxiety about body function or health, persistent insomnia, menopausal symptoms, degenerative joint disease of shoulder region, osteoarthritis of her right knee, adhesive capsulitis of her right shoulder, impingement syndrome of her right shoulder region, mixed insomnia, middle insomnia, and fatigue.  Id. at 7-8.  Petitioner refused to be weighed.  Id. at 7.  Petitioner said she had persistent pain in her right shoulder following an injection in 2012 and was seeking reimbursement for her "injury."  Id. at 8 (the quotations are in the original record).  The pain limited her lifting, playing music, making love with her husband, and cooking.  Id.  On physical examination, her right shoulder was not red, swollen, or hot.  She had range of movement with normal flexion and extension.  However, abduction was limited to approximately 80 degrees before she had significant pain.  There was no palpable crepitus.  Id.  Dr. Lewis diagnosed petitioner with right shoulder capsulitis.  Petitioner stated she suspected this was due to an injection in 2012 (SIRVA).  She wanted Dr. Lewis "to review documents for possible previous shoulder symptoms prior to 2012 as this finding would preclude her from a financial award."  Id.  She would let Dr. Lewis know.  Id.  Dr. Lewis closes with a social history, including petitioner having smoked two packs per day for 15 years.  Id. at 9.

On March 7, 2016, Dr. Chan wrote the history that petitioner gave him that she received a flu vaccination in Durham, NC, in her right shoulder on September 11, 2012.  Within several minutes, she developed right shoulder pain followed by gradual onset of right shoulder stiffness over several weeks.  The right shoulder pain and stiffness persisted together with weakness.  The symptoms worsened any time she had an activity involving her right shoulder or when she was sleeping, particularly if she were on her right side.  She had one session of physical therapy and several sessions of acupuncture.  She denied having any right shoulder problem prior to this flu vaccination.  Med. recs. Ex. 10, at 2.  On physical examination, petitioner had restricted motion of her right shoulder.  Id. at 2.  Dr. Chan diagnosed petitioner with adhesive capsulitis of the right shoulder beginning immediately after a flu vaccination on September 11, 2012.  Petitioner gave Dr. Chan literature regarding SIRVA.  The SIRVA mechanism was felt to be inadvertent direct inoculation of the vaccine into the shoulder (intracapsular or bursa) with subsequent inflammatory response leading to shoulder pain and dysfunction.  Dr. Chan thought, given petitioner's history, that "SIRVA is certainly possible."  Id.  Dr. Chan also considered whether or not petitioner has Parsonage-Turner syndrome (idiopathic brachial plexitis) which is also known to be a potential complication of vaccination.  He noted petitioner's right shoulder x-ray indicated a history of falling with right shoulder pain toward the end of 2013 with a possible nondisplaced glenoid fracture and also large degenerative humeral head osteophytes.  Her fall could also be contributing to petitioner's right shoulder adhesive capsulitis and dysfunction.  Id.

On April 7, 2016, petitioner saw Dr. Chan for an EMG and nerve conduction study of her right upper extremity.  Med. recs. Ex. 10, at 7.  Dr. Chan wrote the results showed no evidence of a neuropathic process to account for petitioner's right shoulder symptoms.  However, she did have electrical evidence of right carpal and cubital (elbow) tunnel syndromes which were unrelated to her right shoulder condition.  Id.  The results showed no evidence of any other focal neuropathy, generalized peripheral neuropathy, brachial plexopathy, or cervical radiculopathy

affecting her right upper extremity.  Id. at 10.

On April 27, 2016, petitioner saw Dr. Howard A. Cohen[16] at the request of petitioner's attorney.  Med. recs. Ex. 31, at 1.  Petitioner questioned Dr. Cohen as to the likelihood that her current shoulder situation was directly related to a flu shot she had in September 2012.  Id.  Dr. Cohen replied, "I made it clear that frozen shoulder can occur without any antecedent trauma and it is a perplexing problem that clearly she is suffering from currently.  I cannot know that the flu shot set off a sequence of events, which resulted in her current disability.  She also relates that long after her shot, she fell and this may also have impacted her shoulder.  I think she is on the right path."  Id.

On April 28, 2016, petitioner saw Dr. Lloyd E. Damon to follow up on her CLL and insomnia.  Med. recs. Ex. 15, at 1.  Petitioner was anxious.  The pain in her knees and right shoulder was worse.  She was exhausted and had decreased motivation.  Id.  Petitioner's white blood cell count was 32.0 (normal from 3.4-10).  Id. at 2.  She weighed 165 lb 3.2 oz.  Id.  Dr. Damon wrote that petitioner's doubling time for lymphocytes (white blood cells) was 28 months, meaning her CLL was slow and therefore good.  Id. at 3.  He diagnosed her CLL as stage 0, favorable risk disease.  There was no clear indication to treat her CLL at that time.  Dr. Damon thought petitioner's significant fatigue could be the result of her advancing age and/or her arthritis.  Id.  Petitioner was taking ECGC (epigallocatchin gallate), which Dr. Damon did not recommend and appeared to be causing her loose stools daily.  Id. at 4.  She did not want to stop taking it.  Dr. Damon also stated that petitioner's immunity seemed good.  He was going to discuss her receiving HiB and Prevnar vaccines at her next visit.  Id.

On May 23, 2016, petitioner saw Dr. John Pelzer primarily for her right knee osteoarthritis but also for her right shoulder.  Med. recs. Ex. 16, at 1.  Dr. Pelzer wrote down petitioner's history that her right shoulder pain began after a vaccination in 2012 and, since then, she had progressive loss of range of motion, but her knee was more painful.  Her shoulder function was quite limited and she did have pain.  X-rays of petitioner's right shoulder showed bone-on-bone changes of her glenohumeral joint without proximal humeral migration suggesting an intact rotator cuff tear and primary localized osteoarthritis.  Id. at 2.  Dr. Pelzer gave petitioner treatment options, including total shoulder arthroplasty.[17]  Id.

On July 5, 2016, petitioner saw Dr. Pelzer.  Id. at 3.  He took new x-rays of petitioner's pelvis which showed mild degenerative changes of her hip joint.  Id.  He repeated his recommendation of right shoulder arthroplasty.  Id. at 4.

On September 7, 2016, petitioner saw Dr. Lewis, complaining of severe low back pain.  He listed petitioner's problems as CLL, hypothyroidism, neutrophilia, anxiety about body

---

[16] Dr. Howard A. Cohen is an orthopedic surgeon and received his medical degree from University of Cincinnati College of Medicine.  Dr. Howard A. Cohen, U.S. NEWS, https://health.usnews.com/doctors/howard-cohen-484246 (last visited March 5, 2018).

[17] Arthroplasty is "plastic surgery of a joints. . . .  Called also *joint replacement*."  Dorland's at 158.

function or health,[18] persistent insomnia, menopausal symptoms, degenerative joint disease of shoulder region, osteoarthritis of knee, adhesive capsulitis of right shoulder, impingement syndrome of right shoulder region, mixed insomnia, middle insomnia, and fatigue.  Med. recs. Ex. 76, at 2-3.  The listing of petitioner's vaccinations still gives the wrong date of her Pneumovax vaccination, stating it was September 19, 2012, when it was September 11, 2012. Id. at 5.  Petitioner had joint replacement of her right knee on August 8, 2016.  Id. at 6.  She was on Oxycodone and aspirin daily for persistent knee pain.  Id.  She was alert and anxious.  Dr. Lewis diagnosed her with CLL, epigastric pain that might be related to gastritis, right flank pain which might be associated with paralumbar spasm, gastritis, and low back pain which Dr. Lewis thought was due to her compensatory gait secondary to right knee pain.  Id.  Dr. Lewis wrote in all capital letters: "PT TAKING TOO MANY OXYCODONE GIVEN TIME FROM SURGERY.  POSSIBLE ASSOCIATE ABDOMINAL PAIN."  Id.

On September 13, 2016, a non-vascular structure was noted on the right lower extremity anterior lateral knee, measuring 2.4 x 1.5 x 2.5 cm.  Id. at 55.  On the same date, petitioner had a venous duplex of her right lower extremity which showed she did not have deep venous thrombosis, but just a small avascular fluid collection along the anterolateral right knee.  Id. at 151.  Dr. Matthew D. Epstein opined this could possibly be prepatellar bursitis.  Id. at 152.

On September 14, 2016, petitioner called the Albany Medical Main Office and said it was urgent.  Id. at 458.  She wanted to discuss her lab results.  She was panicking.  Presumably Dr. Lewis was to return the call.

On October 18, 2016, petitioner saw Dr. David A. Lindenberg, a pain medicine specialist. Id. at 47.  Petitioner complained about severe, aching pain status post-right knee replacement seven weeks earlier on August 8, 2016.  She had her right knee replaced because of knee pain and osteoarthritis.  Her knee pain was worse after surgery than before surgery.  She had excruciating pain the first week after surgery and the pain improved some since then.  She complained of significant fatigue.  Her pain was located in the right knee and moved to different spots around the knee.  Petitioner described her pain as aching and stabbing, ranging from 1 to 10 with an average of 6 out of 10 with 40% of the day hurting.  The pain was worse when she drove.  Rest, medication, massage, ice, and heat eased the pain.  Her sleep was poor and she awakened during the night three to five times a night to urinate.  She was on Klonopin [Clonazepam], titrated down for several months, but resumed Klonopin 7 mg at night.  The pain affected her emotionally.  Other pains included right shoulder which she related to a vaccine in 2012.  Dr. Lindenberg put a question mark after "related to vaccine in 2012."  Id.  Petitioner was on Percocet six times a day for 10 weeks, which helped with her pain but caused cognitive deficits.  She was also on Diclofenac.  Id.  Dr. Lindenberg noted that in 2011, petitioner worked as a sex therapist and wrote books.  Her husband was 47 years old, and she had five grandchildren.  Id. at 50.  He also noted that in 2012, she loved playing the guitar and was in a

---

[18] "Anxiety about body function or health" is a diagnostic category in the ICD-10 ("International Statistical Classification of Diseases and Related Health Problems"), numbered F41.8.  2018 ICD-10-CM Diagnosis Code F41.8, ICD10DATA, http://www.icd10data.com/ICD10CM/Codes/F01-F99/F40-F48/F41-/F41.8  (last visited March 6, 2018).

relationship and very concerned about her decreased libido.  He further noted that in 2015, petitioner still played the guitar and very much enjoyed her grandchildren.  Id.

Dr. Lindenberg performed a physical examination.  Petitioner had 5/5 strength for left and right shoulder abduction, elbow flexion, elbow extension, wrist extension, grip, and finger abduction.  Id.  Dr. Lindenberg also did a knee examination which showed no pain with range of movement.  The scar was well-healed.  Id. at 51.  He did a cervical spine examination which showed petitioner's posture had a forward head, rounded shoulders, straightening of the lordotic curve, and upper thoracic kyphosis (sometimes known as "dowager's hump").  Id.  Dr. Lindenberg's assessment was chronic pain of the right knee most consistent with a neuropathic component since the pain persisted beyond the expected duration.  Petitioner was receptive to a multidisciplinary approach to pain management, including procedures, medication adjustment, physical therapy/exercise, pain psychology, lifestyle modification, and alternative treatments.  Id.  He suggested petitioner reduce the Percocet gradually.  Id.  She could take acetaminophen up to 3,000 mg/day.  Id. at 52.  She should start Cymbalta for nerve pain and mood, and Gabapentin (also known as Neurontin) for nerve pain and possible help with sleep.  In future she was to taper off Klonopin.  Id.  Petitioner was to ask her physical therapist to design a home exercise plan incorporating cardio exercise for endurance.  She should consider a knee brace during exercises.  Dr. Lindenberg recommended pain psychology such as cognitive behavioral therapy, biofeedback, stress reduction, meditation, pacing, coping, minimizing reactionary behavior, and sleep strategies.  He said petitioner should ask her brother-in-law to recommend a pain psychologist.  Id.  Dr. Lindenberg then listed two local pain psychologists and listed four books for her assistance: "Managing Pain Before It Manages You," "Take Charge of Your Chronic Pain," "The Brain That Changes Itself," and "Painful Yarns: Metaphors and Stories to Help You Understand the Biology of Pain."  Id. at 52-53.  He suggested two short videos and two longer videos on pain management and told her to come back in four weeks.  Id. at 53.  Dr. Lindenberg spent 80 minutes with petitioner, 45 of them counseling or coordinating care.  Id.

## Additional Filings

## Sutter Health Sutter East Bay Prevaccination Phone Calls

On May 15, 2012, at 1:07 p.m., petitioner called Sutter Health Sutter East Bay and spoke to Julie May.  Med. recs. Ex. 74, at 100.  Petitioner said she was taken to the ER the prior night by ambulance because she thought she had had a heart attack.  She stated the hospital staff did an EKG and blood work and determined that she did not have a heart attack but thought she had a muscle spasm in her chest.  Petitioner said she was in extreme pain and would like to follow up with a doctor for an appointment on May 16, 2012.  Id.

Also on May 15, 2012, at 4:56 p.m., petitioner called Sutter East Bay and spoke to Stacey Wangsgaard.  Id. at 117.  She wanted to speak to Dr. Birnbaum.  She said she spent all night in the ER and was not given any answers to what was going on with her.  Petitioner said she was having a lot of pain.  She did not have pain lying down, but sitting or moving around caused severe pain.  Id.

## AT&T Postvaccination Phone Call

Petitioner filed a listing of AT&T's telephone records to show that she placed a call on September 14, 2012, at 4:30 p.m. EDT (1:30 p.m. PDT) while she was in Durham, NC, to (510) 204-8130 which is the phone number of Sutter Health Sutter East Bay Medical Foundation where Drs. Birnbaum and Lewis were practicing. Ex. 60, at 29; Ex. 62, at 1; Ex. 64, at 1. (It is unclear why Dr. Lanner Cusin, another of petitioner's treating physicians, is not listed on the pages filed as Exs. 62 and 64.) There is no record of this call in the Sutter Health Sutter East Bay phone records, which have a different telephone number: (510) 204-5013. Ex. 74, at 1, 132.

The AT&T record of this call does not document to whom petitioner spoke or what the parties to the conversation said.

## Sutter Health Sutter East Bay Postvaccination Phone Calls

On September 19, 2012, petitioner returned to the northern California area from Durham, NC. Ex. 22, at 7. The first telephone call petitioner made to Sutter East Bay was on September 24, 2012 to Dr. Lanner-Cusin, her gynecologist. Ex. 74, at 84. The purpose of petitioner's call was to have Dr. Lanner-Cusin order a bone density test (DEXA) because petitioner has osteoporosis. Id. Petitioner did not call Dr. Lewis (as she testified) to say her right shoulder hurt. She did not call to make an appointment to see her PCP Dr. Birnbaum. She did not ask for a referral to an orthopedist.

On November 27, 2012, petitioner called Sutter East Bay because she was having cataract surgery the next day. Id. at 80.

On December 17, 2012, petitioner called Sutter East Bay because she was experiencing flu-like symptoms and wanted a prescription for Tamiflu called into Walgreens. Id. at 75.

On February 14, 2013, Dr. Birnbaum at Sutter East Bay called petitioner because petitioner had been sick since February 13, 2013 with headache and then a fever of 101.8 degrees, cough, and exhaustion. Id. at 74.

On March 8, 2013, petitioner called Sutter East Bay because she found a lump on her left forearm on the palm side that had increased slightly in size. Id. at 70. She originally thought it was located in a vein, but now reported it was a quarter inch from her vein. It was approximately the size of a pencil eraser. It was not discolored and did not have streaks radiating from it. Id. Petitioner said the lump was not interfering with her activity and she said she continued to play the guitar as normal. Id. Petitioner had had the problem for two weeks. Id. at 74. Petitioner did not call to say her right shoulder hurt or that the way she played guitar had changed because of a right painful shoulder.

On August 5, 2013, petitioner called Sutter East Bay saying she had vaginal pain during

intercourse intermittently, but that pain increased the day before.  Id. at 67.  She said it was 7/10 on the pain scale.  Id.

On August 25, 2014, petitioner called Sutter East Bay regarding her concern about a breast mass at the lateral edge of her right breast which appeared to be superficial and was not identified as a mass on mammogram or ultrasound.  Id. at 65-66.

On March 12, 2015, petitioner called Sutter East Bay about having a sleep problem.  Id. at 62.  Sierra Velarde routed this conversation to Dr. Michael Lewis on March 12, 2015, at 11:39 a.m.  Id. at 63.  Petitioner wanted to speak to Dr. Lewis about her medication for panic disorder, Clonazepam.  She had been trying to get off the medication for several months and felt extremely tired.  She wanted to speak to Dr. Lewis about her symptoms.  Id.

On August 13, 2015, petitioner for the first time since she returned from Durham, NC, on September 19, 2012 three years earlier called Sutter East Bay about shoulder pain from a vaccination.  Id. at 56.  Eleven days after petitioner made this phone call, she filed her petition pro se.

On the same day, August 13, 2015, Geri J. Buckner of Sutter East Bay spoke to petitioner at length regarding petitioner's records.  Id. at 55.  Ms. Buckner notes that petitioner was looking for records after 2012 related to a shoulder injury that she received out of state.  Ms. Buckner informed petitioner that the only records Sutter had were from an emergency room visit with Dr. Birnbaum in May 2012 and a pre-operation appointment with Dr. Nufar in August 2012.  Id.  Ms. Buckner also informed petitioner that petitioner's request would be forwarded to Medical Records for further assistance.  Petitioner told Ms. Buckner that she saw Dr. Lewis at the Albany Care Center before (although Ms. Buckner writes there is no documented record of those office visits) and petitioner was trying to locate her paper chart.  Ms. Buckner suggested petitioner contact the office in Albany.  Id.

On November 7, 2016, petitioner phoned Sutton Health and asked that Petra C. Perezeugenio relay a message to Dr. David A. Lindenberg that the medications he prescribed for petitioner's chronic pain were not helping.  Petitioner preferred to get a second opinion from Dr. Ault as Dr. Ault had more experience than Dr. Lindenberg.  Id. at 29.

**Informal communication**

On September 1, 2017, petitioner filed a letter she wrote dated January 13, 2016 to Dr. Michael Lewis, enclosing information about SIRVA for his review, and asking if he would be an expert witness in her vaccine suit.  Ex. 76, at 65-67.  Petitioner's letter, dated January 13, 2016, reads as follows:

Dear Dr. Lewis:

Please find enclosed some information about vaccination-related shoulder dysfunction ("SIRVA") for your review.  For some

months, I have been in the process of making a claim for compensation to **a no-fault** government program which compensates people who with [sic] shoulder injuries which were "more likely than not" to have been caused by vaccines.  **"No-fault" means that this claim is not being made against any provider, not even the pharmacy employee in Durham, NC who gave me the vaccine.**

As my long-term primary care doctor, I'm [sic] sure the Special Master who's reviewing all my records will be especially interested in your assessment of whether or not my injuries are consistent with the SIRVA picture.

Here's a summary of my the [sic] injury-related history:

I received two vaccines on September 11, 2012 at a CVS pharmacy in Durham, NC.  The flu shot was given in my right arm.  Within two hours, I was experiencing severe pain in that arm and shoulder.  I was quite sick for three days afterward, and did not know why.  To my surprise and distress, I experienced continuing pain and increasing immobility of my right shoulder and arm.

For a long time now, I have had "frozen shoulder."  My right arm range of motion is severely limited, in that I can only lift my arm as high as my forehead.  My functioning at work—especially teaching and leading workshops—has been compromised.  I cannot lift anything heavy with my right arm, and even simple motions like pointing to a spot on a blackboard or chart have become painful.  My formerly athletic lifestyle has been compromised as I cannot lift weights, do many yoga postures, or do any exercise that requires my right arm to move freely or to have strength.

Since playing guitar daily is one of my great passions, the pain and relative immobility of my picking/strumming arm is especially distressing.

I have continuing pain, especially at night, and have trouble sleeping on my might [sic] side.  This affects my productivity during the day as I see patients and write.

Until recently, I was unaware that vaccines could result in shoulder injuries, and so missed many opportunities to ask my medical providers to recommend treatment.  At one point, (long after the

vaccine), I fell on the injured shoulder, and did seek help for that. Nothing was done, and the pain, stiffness and immobility returned to the state is [sic] has been since 2012.

Two orthopedists have raised the issue of whether or not surgery or not surgery [sic] would be advisable down the road.

When you have been able to review these articles, and to relate them to the injuries you reported on previously, I would very much appreciate hearing from you.  Of course, if you think I may fit the criteria below, knowing that would be most helpful.  [The rest of the letter summarizes SIRVA.]

Expert Witness Option

P.S.  If you might be interested, my attorney (who is paid by the program) is looking for an expert witness for our case.  You would be paid whatever hourly rate you designate (He mentioned $300-$500) per hour to reviews [sic] the records and provide an opinion.

Proof is not required in these cases.  What is required is medical opinion that at the level of 50.001% or above, there is a likelihood that my injury was caused by the flu shot vaccination [sic].

I have an appointment with you next Tuesday, the 19th, and hope to discuss this with you then.
                                                      VL

Med. recs. Ex. 76, at 66, 67 [emphasis in original].

On October 28, 2016, Dr. Lewis made a notation in a phone record for Albany Medical Main Office that he received a request from petitioner to serve as an "expert witness" regarding her shoulder.  Id. at 458.  He declined to do so and spoke with petitioner on the phone.  Id.  On August 27, 2017, Dr. Lewis, then practicing at One Medical, wrote a note for petitioner which she filed stating that he had never recorded phone conversations between himself and his former patient (petitioner) at any point.  Ex. 77, at 1.

## **Affidavits**

On July 11, 2016, petitioner wrote her affidavit.  Ex. 18.  She states she has suffered from chronic shoulder dysfunction since receiving flu vaccine in her right arm on September 11, 2012. Id. at ¶ 1.  She states she had never had any problems with her right shoulder until the day of vaccination.  Id. at ¶ 3.  Petitioner reiterates the same denial of any pre-vaccination shoulder problems ("never had any in the past").  Id. at ¶ 5.  She recounts a conversation with what she

25

calls a "technician" (who was actually the pharmacist) about in which arm to receive flu vaccine and Pneumovax, saying that he asked her if she had previously received either vaccine to which petitioner responded that she had received flu vaccine many times but never Pneumovax before. She states that the technician suggested she receive flu vaccine in her right arm because she had had no prior problems with flu vaccine and Pneumovax in her left arm in case she had a reaction, to which she agreed "and it was done that way."  Id. at ¶ 6.  She states she remembers the vaccination in her right arm felt higher than usual.  Id.  Petitioner states that her right arm hurt badly within a few minutes and she felt feverish and weak.  The pain worsened and disturbed her sleep and she spent the next three days sick.  Id. at ¶¶ 8-10.  Petitioner states that after a few days, she felt well enough to attend classes at Rice House.  She states she knew nothing about SIRVA then.  Id. at ¶ 11.  In retrospect, petitioner thinks she got accustomed to her new limitations.  Id. at ¶ 13.  Petitioner states that "For a long time, I didn't even think of seeking medical help for my shoulder.  I saw other practitioners, but usually they did not ask about my shoulder.  I didn't know anything about frozen shoulder, or what kind of doctor might have been able to help me."  Id. at ¶ 17.  Petitioner thus blames her physicians for not asking about her shoulder when she never indicated she had any problem with it and, moreover, on December 17, 2012, she answered Dr. Birnbaum's questions in the negative concerning performing activities of daily living, i.e., did petitioner need help with bathing, telephone use, transportation, shopping, preparing meals, doing housework, and doing laundry.  Petitioner answered no to each of these questions.

Also on July 11, 2016, petitioner's husband Patrick Laviolette wrote his affidavit.  Ex. 19.  He states that he frequently spoke with his wife by phone when they were apart.  Id. at ¶ 2.  When petitioner was in Durham, NC, she got sick after her vaccinations which she told him included flu vaccine in her right arm and Pneumovax in her left arm.  Id.  When he met her at the airport in California, he noticed she favored her left arm and had trouble using her right hand.  She told him her right shoulder still hurt and she could not lift much with her right arm or reach higher than her head.  Id. at ¶ 3.  He then goes on to describe continuing disability over the next year until she was diagnosed.  Id. at ¶¶ 4-17.

On August 7, 2017, Stewart Walker, a massage therapist in Durham, NC, wrote an affidavit stating that petitioner had been his patient since 2011. Ex. 56, at 1.  Thus, one year preceding her September 2012 vaccinations, petitioner was seeing Mr. Walker for massage therapy.  Petitioner recently contact him to as if he had any records relating to treatment she received in September 2012, but Mr. Walker did not have any treatment notes or billing documents for that period of time.  He recounts that in September 2012, she came to his office and told him her right shoulder was very painful and that, a few days earlier, she had been vaccinated in both shoulders.  He remembers they had three therapy sessions where he massaged her deltoid, trapezius, and rotator cuff muscles.  He writes that she had pain that increased with her active range of motion and abduction of her right arm was limited.  Id.

Also on August 7, 2017, Karen Almquist, a massage therapist in California, wrote an affidavit saying petitioner had been her patient since 2010. Ex. 58, at 1.  Thus, two years preceding her September 2012 vaccinations, petitioner was seeing Ms. Almquist for massage

26

therapy.  Ms. Almquist's 2012 and 2013 records show petitioner had appointments on December 8, 2012, and April 17, 2013, June 26, 2013, August 8, 2013, and November 13, 2013.  Ms. Almquist states in her affidavit that she remembered petitioner complained of a sore right shoulder and mentioned she had received a flu vaccination a few months earlier and experienced discomfort shortly afterward.  (Ms. Almquist must be referring to the December 8, 2012 visit.)  Ms. Almquist saw petitioner had limited range of motion and stiffness in her right shoulder.  She massaged petitioner's trapezius, rhomboid, deltoid, and rotator cuff muscles.  Id.

On September 27, 2017, Dr. Francis A. Neelon of Rice House Healthcare Program Holdings LLC wrote a letter addressed "To Whom It May Concern."  Ex. 71, at 1.  He states he has known petitioner for many years during her periodic attendance at the Rice Diet Program in Durham, NC, where he served as medical director.  He states, "I can attest to the fact that she is straightforward, hones in her dealings with medical personnel, not given to hyperbole, and accurate in recounting her medical history."  Id.  He also states "I do not have any information related directly to the medical condition under consideration, but I wanted to go on record as being in support of her as a trustworthy medical historian."  Id.  He then swears under penalty of perjury under 28 U.S.C. § 1746 that his statements in the affidavit are true.  Id.

On November 8, 2017, petitioner filed another affidavit from massage therapist Karen Almquist regarding petitioner's appointments with her in 2012 and including photos of Ms. Almquist's appointment books for 2012 and 2013.  Ex. 78.  Ms. Almquist states that petitioner has been her massage client since 2010 and her records show petitioner scheduled appointments with Ms. Almquist on December 8, 2012, and April 17, June 26, August 8, and November 13, 2013.  Id. at 1.  None of these appointments indicates the part or parts of petitioner's body that Ms. Almquist massaged nor do they contain comments about any complaints from petitioner.  Ms. Almquist offers no explanation of how she remembers a conversation she had with petitioner December 8, 2012.

## **Date Book**

Petitioner filed a 2012 date book which she calls her daytimer.  Ex. 22; Ex. 20, at ¶ 2.  She has excerpts in her date book in Exhibit 22, starting on September 10, 2012 when she arrived in Durham, NC.  Ex. 22, at 2.  She recorded on September 11, 2012 that she went to Rice Clinic, had a physical, and checked in.  Then she received flu and pneumonia vaccinations at CVS with a notation that she received flu vaccine in her right arm and Pneumovax in her left arm.  Id.  She records on September 12, 2012 that she was sick with pain in her right shoulder.  Id.  On September 13, 2012, she records that she was still sick and feverish, with pain in her right shoulder, weakness, and aching all over.  Id.

She notes her return from Durham, NC, on September 19, 2012.  Id. at 7.  As the undersigned learned at the hearing, the "x" notations petitioner wrote in her date book signified 20 minutes of playing guitar.  Thus on September 20, 2012, petitioner played guitar for 40 minutes (two "x's").  Id.  On September 21, 2012, petitioner played guitar for 40 minutes (two "x's").  Id.  On September 22, 2012, petitioner played guitar for 60 minutes (three "x's").  Id.

27

On September 24, 2012, she played guitar for 20 minutes and she writes, "Call Dr. L re: shoulder." Id. at 8. Petitioner testified at the hearing in this case that "Dr. L." referred to Dr. Lewis, whom she states was her PCP at the time (although, in actuality, her PCP was Dr. Birnbaum). She testified that Dr. Lewis was dismissive about her purported vaccine injury and "promised" her that it would go away. Petitioner further testified, relying on her testimony that she had a conversation with Dr. Lewis on September 24, 2012, that she did not report shoulder pain to any doctor for a year, i.e., September 2013, because she just assumed per Dr. Lewis that it would go away. But according to the Sutter Health Sutter East Bay phone records, petitioner never phoned Dr. Lewis on September 24, 2012. The "Dr. L" petitioner phoned on September 24, 2012 was Dr. Lanner-Cusin, her gynecologist, to have Dr. Lanner-Cusin order a bone density test (DEXA) for petitioner's osteoporosis. Ex. 74, at 84.

This September 24, 2012 call to Dr. Lanner-Cusin was the first telephone call petitioner made to Sutter East Bay after petitioner returned from Durham, NC, on September 19, 2012. Petitioner did not call to say her right shoulder hurt. She did not call to make an appointment to see her PCP Dr. Birnbaum. She did not ask for a referral to an orthopedist. She wanted Dr. Lanner-Cusin to schedule a bone density test (DEXA) because petitioner has osteoporosis.

On September 25, 2012, petitioner played guitar for 40 minutes and seems to have resumed her guitar and singing performances by noting, "Open mic?" as in whether there was an open microphone at a venue available for her to play guitar and sing. Id. On September 26, 2012, she played guitar for 40 minutes and writes "Karen: massage?" Id. On October 8, 2012, petitioner played guitar for 60 minutes. Id. at 9. On October 9, 2012, petitioner played guitar for 50 minutes (two and one-half "x's"). Id. On October 10, 2012, petitioner played guitar for 80 minutes (four "x's") and she went to yoga class. Id. She notes on October 11, 2012 that she has a dog grooming appointment at 11:00 a.m. Id. She performs at an open mic at 6:30 p.m. on October 12, 2012. Id. On November 12, 2012, petitioner played guitar for 70 minutes (three and one-half "x's"). Id. at 10. On November 13, 2012, petitioner played guitar for 40 minutes and wrote to call a pain class and a cancer support community. Id. On November 14, 2012, petitioner played guitar for 60 minutes. Id. On November 15, 2012, petitioner played guitar for 40 minutes and noted hospice training at a Zen center. Id. On November 16, 2012, petitioner played guitar for 80 minutes and notes going to pain management and then an ear appointment with a question mark. Id. On November 17, 2012, petitioner played guitar for 60 minutes and notes going to yoga with a question mark. Id.

## Records on the Components of a Medicare Annual Wellness Visit

Petitioner filed Exhibits 68-72 for the proposition that when Dr. Birnbaum on December 17, 2012 gave petitioner an annual physical examination, Dr. Birnbaum followed appropriate procedures in asking petitioner a series of questions concerning depression, hearing, vision, and whether she needed help to perform activities of daily living. Petitioner denied she needed help with bathing, telephone use, transportation, shopping, preparing meals, housework, or laundry. Petitioner did not inform Dr. Birnbaum that her right shoulder hurt. What she did tell Dr. Birnbaum was that she loved playing the guitar and singing, and she had been performing at

open mikes (microphones).

### Articles on People Confusing Right and Left

Petitioner filed five articles about people confusing right and left in an attempt to prove that pharmacist Hemal Modi confused her right and left arms when he documented that he vaccinated her left arm with flu vaccine on September 11, 2012. These articles indicate that petitioner more likely confused in which arm she received each vaccine rather than pharmacist Modi.

The first article,[19] dealing with medical students, blames mistakes on distraction. Ex. 32, at 7. The second article,[20] dealing with surgery, attributes mistakes to mental errors. Ex. 33, at 2. The third article[21] blames mistakes on complex verbal directions, compromised health such as heroin addiction, and tricky circumstances such as surgery. Ex. 34, at 1-3. The fourth article[22] deals with avoiding lateral mistakes before surgery by marking the operative site and getting verification by following a checklist. Ex. 35, at 1. The fifth article[23] states that right-left confusion occurs more often in women. Ex. 36, at 2. Among a sampling of men and women, 17.5 percent of the women stated they confused right and left all the time or frequently whereas only 8.8 percent of the men stated they confused right and left all the time or frequently. Id. The author of this fifth article said that the difference between women and men in confusing right and left "was highly significant." Id.

The first four articles (Exhibits 32-35) do not apply to pharmacist Modi as there is no evidence he was distracted, involved in surgery, listening to complex verbal directions, or had compromised health such as heroin addiction when he vaccinated petitioner on September 22, 2012. The fifth article (Ex. 36) published in Archives of Neurology proves that petitioner, who is an elderly woman, was significantly more likely than pharmacist Modi to have confused her left and right arms. She was also more likely to become confused based on the purported conversation she had with pharmacist Modi before vaccination, if this conversation actually occurred. That she wrote the wrong vaccine site for each arm in her date book reflects her right-left confusion and is a fairly common mistake among women, according to Exhibit 36.

### TESTIMONY

Patrick Laviolette, petitioner's husband, testified first. Tr. at 11. He is an EKG technician. Id. He and petitioner have been married for ten years. Id. at 13. Petitioner told him

---

[19] J. McKinley, et al., 'Sorry, I meant the patient's left side': impact of distraction on left-right discrimination, 49 MEDICAL EDUCATION 427-35 (2015).
[20] A. Gardner, Surgery mix-ups surprisingly common (Oct. 18, 2010, 4:50 PM), www.cnn.com/2010/HEALTH/10/18/health.surgery.mixups.common/#.
[21] D. Peters, Be Honest, Can You Really Tell Left From Right? (June 15, 2016), http://daily.jstor.org/can-you-really-tell-left-from-right/.
[22] Ch. 43.2 Strategies to Avoid Wrong-Site Surgery as part of Chapter 43. Prevention of Misidentifications, published by Agency for Healthcare Research and Quality of the US Department of Health and Human Services.
[23] S.M. Wolf, Difficulties in Right-Left Discrimination in a Normal Population, 29 ARCH NEUROL 128-29 (1973).

while she was in Durham, NC, in September 2012 that she received flu vaccine in her right arm and pneumonia vaccine in her left arm.  Id.  Petitioner told him she had a lot of pain in her right arm and some pain in her left arm.  Id.  He said that petitioner had pain when she returned from Durham, NC, a week later until today, but it went up and down with activity.  Id. at 13-14.  Mr. Laviolette remembers that, when petitioner returned from Durham, NC, in September 2012, she continued to do her daily chores but he would help her stir a pot.  Id. at 15.  She continued to play guitar but he does not remember if playing guitar hurt.  Id.  He said both of them and then his wife would take the guitar out of the case.  Id.  Both of them would put the guitar out of the case, but she would too.  Id.  After petitioner came home from Durham, NC, in September 2012, she continued playing guitar at open mics and giving guitar concerts.  Id. at 16.  Petitioner would use a computer to type.  Id.  She continued correspondence, Christmas cards, filling them out and addressing them.  Id. at 16-17.  Petitioner adjusted her posture a little bit while playing the guitar after returning from Durham.  Id. at 17.  Mr. Laviolette assisted petitioner with rolling her suitcase when she returned from Rice House in September 2012.  Id. at 18.  Petitioner carried books in her other arm.  Id.  Mr. Laviolette forgot that petitioner had pain in her right arm May 16, 2012 which Dr. Birnbaum diagnosed as thoracic outlet syndrome because petitioner was playing guitar three hours a day and needed advice on positioning and a home exercise program. Id. at 18-20.

Mr. Laviolette remembered that petitioner had trouble sleeping on her right shoulder because of pain.  Id. at 20.  He does not remember that petitioner needed assistance in bathing by December 2012.  Id.  He does not thinks she needed assistance in shopping.  Id. at 21.  He would help her carry bags in.  Id.  He does not think she needed assistance in laundry.  Id. at 22. Petitioner had been taking Advil before her September 2012 vaccinations for her bad knee and she continued taking it afterward.  Id.  He said petitioner complained about her shoulder a few times.  Id.  He would massage her shoulder sometimes.  Id. at 23.  He would use the cream Arnicare.  Id. at 24.  When Mr. Laviolette cut down a Christmas tree in 2012, petitioner could not put ornaments higher than eye level on the tree.  Id. at 25.  He helped her carry presents.  Id. He would help her get books off the shelf.  Id. at 26.  On July 4, 2013, he and petitioner had a party and, for the first time, he helped her bake a cake because she had trouble using an electric portable mixer.  Id. at 35-36.  Petitioner got most of the ingredients herself.  Id.  When petitioner fell off a stool, she might have hit her shoulder a little bit, but Mr. Laviolette did not remember the exact details.  Id. at 28.

On cross-examination, Mr. Laviolette said he did not quite remember the first time petitioner told him she thought her right arm pain was due to a flu vaccination she received in September 2012, but he thinks it was some time in 2014.  Id. at 31.  He said that petitioner's difficulty using a portable mixer on July 4, 2013 was based on mobility issues rather than pain or weakness.  Id. at 32.

On redirect examination, Mr. Laviolette recounted that when petitioner called him from Durham in September 2012, she said she got the flu vaccine in her right arm and the pneumonia vaccine in her left arm, and that her right arm was quite sore and painful.  Id. at 34.  She told him she was flat on her back, feeling bad.  Id.  Petitioner's counsel asked Mr. Laviolette if he knew

why she told him which vaccine she received in which arm and he said no.  He assumed it was because it was very painful.  Id.

(The court proceeded to take petitioner's testimony until 11:00 a.m. when massage therapist Stewart Walker was scheduled to testify by phone from Durham, NC.  To simplify reading this opinion, the undersigned shifts now to Mr. Walker's testimony, followed by petitioner's testimony.)

Stewart Walker testified for petitioner.  Id. at 62.  He owns Holistic Health Studio.  Id. at 63.  He treated petitioner in 2011 for several visits and then saw her in 2012.  Id. at 64.  He approximated the dates in 2012 as September 14th, 17th, and 18th.  Id.  He approximated the dates because he moved his records from his studio to his house in 2016, but he was not able to find these specific notes later.  Id.  Petitioner saw Mr. Walker because she had pain in her right shoulder.  Id.  He probably did a little bit of general work on her neck and left shoulder.  Id. at 65.  He remembers petitioner "rather well" even without her having contacted him recently to obtain his affidavit and procure his testimony.  Id.  Mr. Walker said petitioner is a distinguished scholar in a poet, Rumi, of whom he is very fond.  Id.  He described petitioner as a "fascinating person."  Id.  In 2011, the year prior to her 2012 vaccinations, Mr. Walker treated petitioner for low back and hip problems and did some general work with her neck and both shoulders.  Id.  Mr. Walker is loosely affiliated with the Rice House program.  Id.

Mr. Walker recounted that, on September 14, 2012, petitioner told him that she was having serious pain in her right shoulder which was recent and that she received a flu vaccination in that arm.  Id. at 66.  He was not able to give her substantial relief.  Id.  Petitioner contacted Mr. Walker about two months previous to the hearing.  Id. at 67.

Petitioner testified.  Id. at 36.  She is a clinical psychologist.  Id. at 37.  She is also a writer, teacher, and sometime musician.  Id. at 38.  She described the Rice House as a health and fitness program which she attended primarily for weight loss and also because Rice House is closely associated with Duke Medical School.  Id. at 39.  When she is at Rice House, the doctors there are also affiliated with Duke Medical School and provide her with medical services there, such as an audiologist.  Id.  She has not been at Rice House since 2012 and they have since closed.  Id.

Petitioner receives flu vaccinations almost every year, particularly since she has grandchildren and is concerned about protecting them.  Id. at 40.  She estimates in the last 30 years, she has received 20 flu vaccinations.  Id.  She stated she remembered "perfectly" in which arm she received flu vaccine and Pneumovax vaccine on September 11, 2012.  Id.  She stated she had a "pretty detailed conversation" with the pharmacist prior to vaccination.  Id. at 41.  They discussed in which arm to put which vaccine and petitioner explained to the pharmacist that she had had pneumonia vaccine many times and had not problems with it but had never received pneumonia vaccine before and did not know what effects of the pneumonia vaccine would be.  Id.  The undersigned called to petitioner's attention her mistake in saying "pneumonia vaccine" twice.  Id.  She corrected herself and said she had received flu vaccine many times.  Petitioner

said she told the pharmacist that she was right-hand dominant and she used her right arm professionally in her professional life, in her musical life, and in her intimate life, and depends on her right arm.  Id.  She and the pharmacist decided together (she thinks he suggested it and she agreed) to put flu vaccine in her right arm and Pneumovax in her left arm "and that's what was done."  Id. at 42.  She said in answer to her counsel's question why she did not have both vaccines administered to her left arm that she was afraid because she had heard stories of having two vaccines in the same arm causing problems, "and I'm not an M.D., so I'm not an expert at all, but I was afraid to have both of them in the same arm."  Id.

Petitioner's counsel then went through the vaccine consent form that petitioner signed on September 11, 2012 with pharmacist Hemal Modi's name on the bottom of it.  Id. at 43-44.  Petitioner recognized him as the pharmacist because she did a lot of searching trying to find out who gave her the vaccines.  Id. at 44.  She tried many times to contact pharmacist Modi.  She wrote him a personal letter.  She left him many voice mails.  Her counsel made some efforts to reach pharmacist Modi and he never responded.  Id.  The vaccine form says that pharmacist Modi administered flu vaccine to petitioner's left deltoid on September 11, 2012.  Id.  Petitioner's response to her counsel's question whether she agreed or disagreed was: "I disagree most vehemently, and I don't understand why that was written after a long conversation about what we were going to do, him writing this."  Id. at 45.  If she had to make the same decision today about in which arm to have flu vaccine and which to have Pneumovax vaccine, she would "most definitely" make the same decision she made on September 11, 2012.  Id.

Petitioner is not certain which vaccine she received first, i.e., the flu vaccine or Pneumovax.  Id. at 49.  Pneumovax gave her some soreness, but the flu vaccine did not seem to hurt quite as much.  Id.  She was nervous because she has always been a little nervous about needles.  Id.  She thought the flu vaccination was a little bit high.  Id.  Petitioner continued:

> But the most – the most important thing that happened was that
> later on – not very long at all in the day, so within an hour or two, I
> started getting – or minutes – it just was – it was just different than
> any other vaccine.  It was very, very painful, and the pain
> continued getting more and more intense and was very intense for
> that whole night and kept me up that night.

Id. at 50.  The next day, petitioner called Dr. Neelon.  Id.  He asked her to come in and get an examination, which she did.  Id.  Petitioner said Dr. Neelon "is a very wonderful man who we all loved at the Rice House, a Harvard-educated man who loves Mary Oliver . . . ."  Id. at 50-51.  Petitioner described Mary Oliver as a poet.  Id. at 51.  She stated she and Dr. Neelon made a connection because they did a few recitations of poetry together in different informal gatherings at the Rice House.  Id.  She said he is a "wonderful doctor, highly respected at Duke Medical School and all around the area, and I had complete trust in him."  Id.  Dr. Neelon had treated her previously.  Id.

Petitioner explained the reason she put in her date book for September 11, 2012 that she

received flu vaccine in her right arm and pneumonia vaccine in her left arm was because she "was trying to have a record to take home to give to my doctors at home, because it was such a – it was such a big thing that happened." Id. at 52. Petitioner said she was sick for several days. Id. at 53. After the undersigned read Dr. Neelon's letter to petitioner dated September 24, 2012, in which he adds a written note stating she had a white blood count that "was up a little," probably reflecting her "viral illness," petitioner stated "that this is the first time that my white blood cell count was way elevated, not as high as it would become in another year, but it was high enough" and her thought was this was when she had leukemia although she did not have it "technically" then." Id. at 56-57. Petitioner admitted that her leukemia is stage zero, but she has fatigue and she thinks there are some "digestive things that go along with it." Id. at 58. She does not need chemo. Id.

The undersigned inquired whether Dr. Birnbaum had done a blood test and petitioner said Dr. Birnbaum was never her primary care doctor. Id. at 59. She stated she knew it "kind of looks like that I think in the records, but she never was." Id. She would see Dr. Birnbaum only if she could not see the person whom she usually saw, i.e., Dr. Lewis, but then he moved and petitioner went to see Dr. Birnbaum. Id. (This is inconsistent with the medical records which show that, on November 12, 2012, petitioner filled out a questionnaire for Sutter East Bay listing Dr. Birnbaum as her PCP. Med. recs. Ex. 75, at 2. In 2009, Dr. Lewis had been her PCP, followed in 2010 by Dr. Kate Westbrook. When petitioner saw Dr. Lewis on July 3, 2013, she told him she had transferred her personal care from Dr. Birnbaum to him for undisclosed reasons. Med. recs. Ex. 76, at 30.)

Petitioner stated that during the time Dr. Lewis had blood tests done and then redone,

> Ah, I believe that my – my right arm continued to – continued and continues until this day to be painful with activity. My range of motion started to decline very soon after the vaccination and has never – never improved very much above this (indicating).

Id. at 60-61.

The undersigned asked petitioner what the repetitive 'x's" were in her date book entries for April 30th, May 1st, May 2nd, May 3rd, May 4th, and Buddha Day. Petitioner said each "x" represents 20 minutes of guitar practice each. But these dates reflect April 30, 2012 to May 4, 2012, probably filed in error. Id. at 69. The whole exhibit reflects dates in 2012. Id. at 70. Petitioner played guitar on September 20th for 40 minutes (two "x's"), September 21st for 40 minutes (two "x's"), and September 22nd for 60 minutes (three "x's"). Thus in a three-day span of time, petitioner played guitar for more than two hours. She testified that the note on September 24th to "call Dr. L. re: shoulder," meant to call Dr. Lewis. Id. at 72. (This could not be true because petitioner's lengthy filing of phone calls she made to Sutter East Bay shows that on September 24, 2012, petitioner called Dr. Lanner-Cusin (whose last name begins with "L") to have Dr. Lanner-Cusin order a bone density test (DEXA) for petitioner's osteoporosis. Ex. 74, at 84. Moreover, Dr. Lewis was not petitioner's PCP in 2012. Dr. Birnbaum was. Petitioner did

not call Dr. Birnbaum about shoulder pain or anything else during this period of time.)
Petitioner testified that she had spoken to Dr. Lewis "along the way" on the phone and he told
her not to worry, everything was going to be fine, and there was nothing to worry about.  Id.
There is no record of petitioner's calling Dr. Lewis during this time period.

Although petitioner's date book has an entry on September 26, 2012 to call Karen
(Almquist) for a massage, petitioner does not think she saw Ms. Almquist until December 8,
2012.  Id. at 73.

On October 12, 2012, she went to a hall at the intersection of Cedar and Bonita in
Berkeley to play guitar and sing at an open mic that usually happens on the second Friday of the
month.  Id. at 76-66.  She said she played the guitar as a classical guitarist would with the body
of the guitar between her knees and holding her left arm up.  Id. at 78.  That means the right
shoulder does not have to bend up very far.  Id. at 79.  Petitioner is not a classical guitarist.  She
writes her own music and plays old standards a lot.  Id.  Petitioner's husband probably was not
there that Friday night as he works at night.  Id. at 81.

Petitioner said she was diagnosed with leukemia by November 13, 2012.  Id. at 83.  She
said, "Yes, I was.  It was in the fall of '12."  Id.  (The undersigned does not see any medical
record before 2013 diagnosing petitioner with leukemia.  On November 1, 2013, petitioner was
noted to have a high white blood cell count of 18.6 when the normal range was 4.8-10.8.  Med.
recs. Ex. 4, at 75.  Also on November 1, 2013, petitioner saw Dr. Natalie A. Marshall, an
oncologist, as a new patient.  Med. recs. Ex. 76, at 119.  Dr. Marshall was petitioner's first
oncologist.  She switched to Dr. Damon afterward and considered switching to a third oncologist
later.  It is unfathomable and not credible that petitioner received a CLL diagnosis in the fall of
2012 and her PCP did not refer her for appropriate care until over a year later.  Moreover, after
July 3, 2013, Dr. Lewis became petitioner's primary care physician.  It makes sense that Dr.
Lewis would have been doing repeat blood tests rather than Dr. Birnbaum who was still
petitioner's PCP in 2012 because it was he who discovered petitioner's highly elevated white
blood count and referred her to oncologist Dr. Marshall.)

Petitioner said that the November 13, 2012 notation about a pain class at a cancer center
was for her CLL, which the records show does not cause her pain because it is stage zero and
was not diagnosed until 2013.  The undersigned assumes petitioner was confused and mixing up
years and times of diagnosis when she testified that she sought a cancer support community
lecture on pain.

She drove to a lunch with friends which was a three-hour round trip on November 14,
2012.  Id. at 84-85.  She stated she compensated with her left arm.  Id. at 85.  Getting her seat
belt on was no problem.  She could reach for it with her left hand and bring it all the way to the
right and then push it in with her right hand.  Id.

Petitioner testified that, on September 14, 2012, she called Dr. Lewis at home because he
was her primary care doctor then, and she talked to him a bit about what was going on

34

> and he said – he was pretty dismissive about it and said, really, it
> was nothing to worry about.  People have unusual reactions to
> vaccines, and it will go away by itself.  I remember the words, "I
> promise you it will go away by itself, so don't worry about it."

Id. at 92.  Then, petitioner switched her testimony from calling Dr. Lewis at home on September
14, 2012 to calling him in the medical office, even though this was at 8:30 p.m. Pacific time.
She testified that Dr. Lewis was with a patient and the person who answered the phone said he
would eventually bring Dr. Lewis on.  Id. at 95.  Petitioner testified that the phone conversation
did not last long because she was on hold for a while.  Id.

On petitioner's return to California on September 19, 2012, petitioner testified she still
did not feel really well.  Id. at 97.  She still had pain and stiffness and could not move her arm
normally.  Id. at 98.  The acute pain had subsided, but she does not know when:

> I guess what had happened is it had subsided, the acute pain had
> subsided to the point that it was – it had really – there was a point –
> I was trying to figure out exactly when this point was, and I'm not
> sure I know exactly.

Id.  Petitioner testified that she compensated with her left hand when engaged in activities, but if
she were not moving, she did not have pain.  Id.  She did not see any doctors right away.  Id.
She testified that she had already spoken to her primary care doctor (meaning Dr. Lewis even
though he was not her primary care physician in 2012) and he said she should not worry about it.
Id. at 98-99.  She saw no reason to make an appointment with him because he said she would be
fine.  Id. at 99.  She states, "I took that to heart."  Id.  She testified she had been seeing Dr. Lewis
for a number of years and this was his professional opinion.  Id.

She saw massage therapist Karen Almquist on December 8, 2012 and four of five times
in 2013.  Id.  Massage therapy was her "treatment of choice, my feeling that here's one person
who can actually address this issue, who's trained to address a shoulder problem, shoulder pain
and shoulder mobility."  Id.

Petitioner then recounted the two medical appointments she had at the end of 2012.  The
first was on November 12, 2012 with her gynecologist and the appointment, as far as she was
concerned, did not have to do with her shoulder.  Id. at 100-01.  Petitioner identified her
gynecologist as Dr. Nina Birnbaum.  Id. at 100.  The undersigned corrected her and told her her
gynecologist was Dr. Katarina Lanner-Cusin.  Petitioner agreed.  Id.

Petitioner filled out a questionnaire for Dr. Lanner-Cusin when she saw her on November
12, 2012 and, in answer to question 12, on page 2 of the questionnaire, "Have you had any
significant medical problems or surgeries over the last year," petitioner answered, "Yes, cataract
surgery, excellent result."  I asked her about her not writing in this answer that her right shoulder

had changed radically since September 11, 2012.  Id. at 102.  Petitioner responded that she did not consider her right shoulder a significant medical problem.  She said she did not consider it a medical problem at all.  Id.

The undersigned then asked petitioner why, on page 3 of the questionnaire, in answer to whether she had significant muscle or joint pain, petitioner wrote in answer "right knee pain," but did not write "shoulder pain."  Petitioner responded saying that she was surprised herself when she saw her answer and wondered why she did not also put down her shoulder.  She said that she had been seeing knee surgeons since around 2010 and, the first time, was at Duke Medical School in Durham, NC.  Id. at 102-03.  She said her knee pain was acute intermittently.  Id. at 103.

Describing her annual visit with Dr. Birnbaum on December 17, 2012, petitioner said the doctor sat in the far corner of the room with her laptop and typed the entire time, "pretty much" not touching her at all and did not examine anything.  Id. at 106.  Someone, she thinks it was a nurse, took her blood pressure.  Id.  Petitioner told Dr. Birnbaum that she loved playing the guitar and singing and had been performing at open mics, and answered in the negative to the question whether she felt little interest or pleasure in doing things.  Id. at 110.  Dr. Birnbaum asked petitioner a number of questions concerning whether she needed help in activities of daily living, and petitioner answered "no" to all of them.  Id. at 111-13.

The undersigned asked petitioner why she did not tell Dr. Birnbaum that her right shoulder was not as it had been before and she was really concerned.  It had been three months and nothing has changed.  She cannot do what she used to do.  Id. at 114.  Petitioner responded that that was a good question and she was not sure she knew the answer.  Id.  She considered her 2012 annual visit to Dr. Birnbaum "a fast screening kind of thing."  Id.  Petitioner denied giving Dr. Birnbaum the wrong date of October 1, 2012 for her flu vaccination, but she does not know why the Sutter Health records list that date.  Id. at 116.  She agreed that Sutter did not know she had received Pneumovax vaccine, and lists it as overdue.  Id. at 117.  She apparently did not tell Sutter about the Pneumovax vaccination.  Id.  Petitioner thought she had not been as conscientious as she should have been to write down her vaccination records and send them to her doctors.  Id. at 118.  Referring to Exhibit 69, at 1, petitioner said that Sutter had a protocol that Medicare requires them to follow for wellness examinations.  Id. at 119-20.

Petitioner's counsel called petitioner's attention to a Walgreen flu vaccine consent form dated October 6, 2013, Ex. 39, at 1, which she signed but could not say she wrote in answer to whether she ever had a serious reaction to a flu vaccine or any other vaccine in the past, "no reaction, sick?"  Id. at 126.  She said, "No, I can't say.  I can't say if it is or not.  It seems like it makes sense that it would be."  Id.  She continued, "I'm not sure.  The question mark could be anybody's handwriting, I guess."  Id. at 127.  She said she did not recognize the printing.  Id.  She did not remember if the question mark was hers.  Id. at 127-28.  She said that October 16, 2013 was slightly before she began to "really put things together," and she was "thinking about it at that time. . . ."  Id. at 128.  She said she did not know anything about SIRVA at the time.  Id. at 129.

Petitioner said what prompted her "to figure it out" was seeing Dr. Louise Nurre on December 27, 2013.  Id.  Petitioner had fallen off a low stool which changed her pain level 10 or 15 percent and she was worried about it.  Id. at 130.  She was worried about it, saying "I'm a pretty anxious person anyway . . . ."  Id.  When Dr. Nurre asked petitioner to raise her arms, her right arm did not go beyond the top of her head while her left arm went all the way up straight.  Id.  She told Dr. Nurre she had a severe problem with mobility in her right shoulder but she did not know why.  Id.  After petitioner fell off the stool onto her right shoulder, it had hurt her since then.  Petitioner wanted Dr. Nurre to write out multiple prescriptions for Clonazepam so that she did not have to keep asking for refills.  Dr. Nurre asked petitioner to discuss this request with her PCP, who at that time was Dr. Lewis.  Dr. Nurre reminded petitioner she could use the patient portal.  Then petitioner inquired about her knees which intermittently hurt and swelled.  Id.  Sometime after this December 27, 2013 visit to Dr. Nurre, petitioner went on the internet.  Id.  She went to a party and met a nurse who told her a friend had something called SIRVA.  Id. at 133.  Petitioner researched SIRVA after that conversation.  Petitioner denied telling Dr. Nurre that she had a several year problem with mobility of her right arm.  Id.  Petitioner said Dr. Nurre made a mistake.  She said she knows "for sure" she did not say that because she did not have a several year problem with mobility.  Id.  Petitioner denied telling Dr. Nurre she received Pneumovax vaccination on September 19, 2012, instead of September 11, 2012.  Id. at 135.  The undersigned asked petitioner why petitioner did not tell Dr. Nurre that she received flu vaccine with the Pneumovax vaccine and that is when the problem in her shoulder began.  Id.  Petitioner responded, "I don't know.  I don't know that that – that I even knew that."  Id.  The following colloquy occurred:

> THE COURT:  You didn't know it when it happened –
> THE WITNESS:  I mean, I knew that I had had this long history, but I wasn't putting it together.  This is a – this is a – really a – I don't know.  I know you must deal with hundreds of cases like this, so I'd be curious to know if other people have this kind of issue where you don't know that a thing exists as a medical condition, so there are things that you do and say when you don't know that something is a medical condition.
> THE COURT:  I can answer your question.
> THE WITNESS:  Okay.
> THE COURT:  I don't expect lay people – that is, people who aren't medical doctors – to diagnose themselves.  I don't expect people to understand what their condition is called, but I do expect them to know if they're in pain, what day it happened, and if it happened in juxtaposition to a vaccination, to say, "This is what happened when I was vaccinated," and they never forget that.
> THE WITNESS:  Um-hum, um-hum.
> THE COURT:  And so what disturbs me is that you claim that you didn't put it together and yet you say that ever since September 11th, 2012, your right arm has not been the same.  I can't put that

together.  That's my problem.

Id. at 135-37.

Petitioner responded that she did not think Dr. Nurre would make a difference because
she was Dr. Lewis's assistant and he had told petitioner that she was going to be fine and there
was nothing to worry about.  Id. at 138.  She could not say why she did not mention her arm at
that time.  Id.  The undersigned called to petitioner's attention that Dr. Lewis attributed her right
shoulder problem to osteoarthritis and, after she sued, he wrote "I do not see how a flu
vaccination could cause this."  Id. at 138-39.  Petitioner said Dr. Lewis does not know what
SIRVA is even though she sent him articles on SIRVA.  Id. at 139.  Petitioner said that Dr.
Lewis refused to testify for her because he did not want to get involved in a medical case.  Id. at
140.  She said that she did not think Dr. Lewis believed her when she told him it was a "no-fault
case" and "not a lawsuit."  Id.  "We're not trying to get anybody or get anybody in trouble,
certainly not anybody in California or even in North Carolina where the whole thing occurred."
Id.

Petitioner's counsel brought up petitioner's visit to Dr. Brad Zwahlen on January 21,
2014.  Id. at 145-46.  She had fallen on her right shoulder the prior evening for a second time.
Id. at 145.  Petitioner's counsel read the medical note in which petitioner said she had decreased
range of motion for a couple of years, but it was worse since her fall in December 2013.  Id. at
145-46.  Petitioner denied telling Dr. Zwahlen that she had decreased range of motion in her
right shoulder for a couple of years.  Id.  She found out that nine out of ten doctors had never
heard of SIRVA.  Id. at 147.  She attributed her lack of shoulder mobility to aging but it did not
seem to her to be something to tell her doctor.  Id. at 148.

The undersigned asked petitioner about her visit to Dr. Lewis on June 16, 2014 and his
notes for that visit.  Id. at 152.  The following colloquy occurred:

> THE COURT:  Why would you not have said to him – unless it's
> your testimony that you did – that the reduction in your ability to
> move your right shoulder is related to the frozen shoulder which is
> from the pain that you had instantly when getting a vaccination in
> your right shoulder in September 2012?
> THE WITNESS:  I think I did say something like that to him.
> THE COURT:  And he just didn't write it down?
> THE WITNESS:  He – he never – he never believed it.  He never
> thought that a vaccine would have anything to do with a shoulder
> problem.  He said that clearly from day one until the day I asked
> him to write me a letter to help me with this case.  And he said,
> "No, I'm having nothing to do with it.  I don't do that.  I don't get
> involved in legal cases."

Id. at 152-53.

38

Petitioner's counsel refreshed petitioner's memory of when she went on the internet by referring to her visit with Dr. Birnbaum in March 2015 when petitioner told Dr. Birnbaum that she had a frozen right shoulder for some time and thought it might have been from getting flu and Pneumovax vaccinations together in 2012. Id. at 156. Petitioner went on the web to look up the internet medical school and looked up SIRVA and a "light bulb" went off that all her symptoms matched everything on the web. Id. at 157. Petitioner said this research occurred in the months after she saw Dr. Nurre in December 2013. Id. She concluded "it was an almost perfect match." Id.

Petitioner said that her range of shoulder motion started being greatly reduced within the first day [presumably of vaccination] since September 2012. Id. It kept getting worse. Id. The undersigned commented that it was puzzling that all of petitioner's physical examinations showed she had maximum strength in her right arm even though she states her right arm mobility was reduced. Id. at 159. Petitioner denied losing strength in her right hand, right forearm, and right elbow. Id.

Petitioner denied that she had anything wrong with her shoulder in May 2012 even though her visit to Dr. Birnbaum resulted in Dr. Birnbaum's analysis of petitioner playing her guitar too much (three hours daily) with improper posture. Id. at 161. Petitioner had the night before gone to the emergency room because she thought she was having a heart attack. Petitioner stated:

> THE WITNESS:  Yea, I remember something in that report [Dr. Birnbaum's record of petitioner's visit on May 16, 2012] that sounded wrong, sounded like something about my shoulder.  It had nothing to do with my shoulder.  It was – I had a very pronounced pain in where I think my heart is – I'm not sure exactly where it is – but I think it's, like, right about there (indicating) –
> THE COURT:  You can't say "there" to a transcript."
> THE WITNESS:  Okay, so right under my left breast, where I think my heart is, I had a tremendous, really strong pain that frightened me.  I was alone at the time.  Patrick was out of town, and I called the paramedics thinking maybe I was having a heart attack, and they said – they came and examined me, and they said they wanted to take me to the ER, did I want to ride in an ambulance, which I never had before.  Okay.  So they took me in an ambulance to the ER, and I stayed there overnight, and they ran a bunch of different tests during the night and gave me some kinds of medications, and I slept there overnight.  I remember my son came to pick me up the next morning, and at the end of the night, they said, no, it's – it's not a – it wasn't a heart attack.  It wasn't anything cardiac.  It was – as far as we can tell, it was an inflammation of the – of the chest lining, which I didn't know that

–

THE COURT: I thought it was lungs.

THE WITNESS: -- I didn't know that existed, but anyway, it was something that I hadn't heard of, which they said I had, which accounted for that thing, and I was sent home, and that was the end of it. It never recurred.

THE COURT: Well, all I can tell you is that in the medical records –

THE WITNESS: What was the shoulder part?

THE COURT: --and I'm trying to find the page where I saw … We.., Dr. Birnbaum notes – I think it is her notes. This is – yes, note of May 16, 2012, page 397, recounts that you had gone to the emergency room where the myocardial infarction was ruled out and you were sent home without a diagnosis, and you spoke with the doctor on call the prior night who told you it seemed like a pleuritic – which would be fluid – inflammation of the chest wall, and you thought, you told Dr. Birnbaum, it might be related to playing the guitar. You were worried because you had a concert that weekend. You said to Dr. Birnbaum you play the guitar at least three hours a day. You had been working on your right arm position but not your left. And then she diagnoses you, which is on the prior page, page 396 of Exhibit 76, with thoracic outlet syndrome, and she prescribes physical therapy to assist you with home exercise program and also positioning your body during guitar playing.

Id. at 161-64.

Petitioner then deprecated Dr. Birnbaum, saying she was "not a very accurate reporter," which comment petitioner prefaced by saying: "This is a problem I have had a few times in this whole process, and I'm sure most professionals feel this way. You don't like to speak badly about other professionals. It's – you know, it's just something you don't do unless – unless there's something egregious that you have a responsibility to report or something. So I have that problem when I say that Dr. Birnbaum is not a very accurate reporter." Id. at 167. Petitioner denied ever playing guitar three hours a day in her entire life because she does not have three hours a day. Id. Petitioner accused Dr. Birnbaum of "hyperbole" and of "rushing a lot." Id. Petitioner said, although she hated to criticize Dr. Birnbaum "really," but there were a few things in the medical record that were not accurate and this was one of them. Id. at 167-68. She said, "I don't think it was my guitar playing that caused that, whatever that was." Id. at 170.

Petitioner admitted that she had no way of knowing in which arm the pharmacist vaccinated her with flu vaccine and Pneumovax vaccine: "I don't know. I have no way of knowing." Id. at 172. She said she had asked herself that question: "How would I know? It would have been nice if there were two bottles on the counter labeled one or the other and I

could have watched him fill the syringe and then do what he did, and then I'd be able to answer that, but that was not the case." Id.   When she did her SIRVA research on the internet, she did not research how many people reacted to Pneumovax.  Id.  Petitioner said she "made many many calls to try to talk to [the pharmacist] and see if – hoping maybe he would remember that conversation … but he didn't respond, never responded.  We made every effort." Id. at175.

Petitioner testified that after she fell off a stool onto her right shoulder in December 2013, she does not recall falling again on her right shoulder weeks later.  Id. at 176.  She thinks she was playing the guitar and lost her balance and fell over.  Id. at 178.

On cross-examination, respondent's counsel asked petitioner if she attributed her fever and achiness for three days after her September 11, 2012 vaccinations to the vaccinations.  Id. at 187.  Petitioner answered:  "Ah, I don't know.  I'm not a physician.  I didn't – I didn't have any respiratory illnesses when I went there.  So I don't know.  I don't know what the cause was.  I just know that's what I felt." Id. at 187-88.  The fever went away, but the achiness never resolved.  Id. at 188.  She was feeling better when she returned from North Carolina on September 19, 2012.  Id. at 189.  She played her guitar the last couple of days before she left North Carolina.  Id. at 190-91.

In describing her right arm pain, petitioner said it ebbs and flows and is activity-related. Id. at 193.  That has been consistent since September 11, 2012.  The next doctor visit she had was on November 12, 2012 to Dr. Lanner-Cusin, her gynecologist, for whom petitioner filled out a 14-point review of systems and did not mention she had right shoulder pain.  Id. at 196. Petitioner said she remembered seeing this document and wondered why she did not mention her right shoulder pain, but her right knee pain was very acute, she had gotten used to her right shoulder pain, and it was not on her mind.  Id.  On December 17, 2012, petitioner saw Dr. Birnbaum, whom petitioner stated had "never" been her primary care physician [even though petitioner had listed Dr. Birnbaum as her PCP on petitioner's annual form for Sutter Health, dated November 12, 2012.  Med. recs. Ex. 75, at 2].  Id. at 197.  Petitioner did not tell Dr. Birnbaum she had right shoulder pain.  Id. at 198.  Petitioner interpreted the questions whether she needed assistance in bathing, using the telephone, transportation, shopping, or cooking (to all of which she answered "no") to be inquiring whether someone needed in-home care.  Id. Petitioner denied that she had ever had surgery for enlarged veins when she saw Dr. Birnbaum for a lump on her left arm.  Id. at 199-200.  Petitioner admitted that massage therapy is nothing new to her.  Id. at 219.

## DISCUSSION

Special masters presume medical records created contemporaneously with the events they describe are accurate.  Cucuras v. Sec'y of HHS, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Decisions of the judges on the U.S. Court of Federal Claims have followed Cucuras in affirming special masters' findings that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  See, e.g., Doe/70 v. Sec'y of HHS, 95 Fed. Cl. 598, 608 (2010) ("Given the inconsistencies between petitioner's

testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of HHS, 468 Fed. Appx. 952 (Fed.Cir.2011) (non-precedential opinion); Doe/17 v. Sec'y of HHS, 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of HHS, 65 Fed. Cl. 35, 41–42 (2005); Snyder v. Sec'y of HHS, 36 Fed. Cl. 461, 465 (1996), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

When a special master considers the weight to accord oral testimony that conflicts with contemporaneous records, the special master generally holds "that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." Murphy v. Sec'y of HHS, 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir.) ("Where such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact."); Montgomery Coca–Cola Bottling Co. v. United States, 615 F.2d 1318, 1327 (Ct. Cl. 1980) ("The subjective intent testimony of the plaintiff can only be seriously considered to the extent it is consistent with the objective evidence....  We also believe that [the testimony of a particular fact witness] is 'infected with self-interest' and that while his testimony, of course, is admissible it cannot be given the weight accorded it by the trial judge; nor can [that fact witness'] testimony prevail over the inferences unavoidably drawn from the objective documentary evidence...."); 32A C.J.S. Evidence § 1033 (1964).  Records that are clear, consistent and complete should be accorded substantial weight.  Lowrie v. Sec'y of HHS, No. 03–1585, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

In considering testimony, the special master must assess the demeanor of the witnesses when testifying.  Andreu v. Sec'y of HH, 569 F.3d 1367, 1379 (Fed. Cir. 2009).  Moreover, to overcome the presumptive accuracy of the written medical records through testimony, the testimony must be "consistent, clear, cogent, and compelling."  Sanchez v. Sec'y of HHS, No 11–685, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing Blutstein v. Sec'y of HHS, No. 90–2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  "The special masters have great leeway in how they conduct proceedings, including what evidence to consider and how to weigh that evidence, and their credibility determinations and fact-intensive conclusions are afforded great deference."  Synder ex rel. Snyder v. Sec'y of HHS, 88 Fed. Cl. 706, 718 (Fed. Cl. 2009).

The Federal Circuit in Capizzano v. Sec'y of HHS, 440 F.3d 1317, 1326 (Fed. Cir. 2006), emphasized that the special masters are to evaluate seriously the opinions of petitioner's treating doctors since "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury." See also Broekelschen v. Sec'y of HHS, 618 F.3d 1339, 1347 (Fed. Cir. 2010); Andreu v. Sec'y of HHS, 569 F.3d 1367, 1375 (Fed. Cir. 2009).

Petitioner filed her petition pro se and moved to proceed in forma pauperis.  The undersigned granted petitioner's motion to proceed in forma pauperis.  Petitioner explains her one year failure to tell any of her doctors that her right shoulder was painful with the excuse that

42

she did not connect her flu vaccination with her shoulder pain.  This makes no sense in light of the fact that petitioner also testified that she knew as soon as she received the vaccine in her right shoulder that she was in pain and the achiness went away.  Her claim of not reporting her right shoulder pain also conflicts with petitioner's frequent contacts with her doctors, leaving them messages to contact her.  Petitioner normally visits her doctors when she has a problem, changes doctors when she is not satisfied with one or more of her doctors, and has been diagnosed with panic disorder, anxiety disorder, and anxiety about body function or health.  She sought medical assistance before her 2012 vaccinations for alcoholism, chain smoking, obesity, osteoarthritis, osteoporosis, thyroid, sexual issues, and excessive guitar playing with poor posture, resulting in pain in her right shoulder and neck which she reported to Dr. Birnbaum on May 16, 2012.  Moreover, she purportedly told two massage therapists, Stewart Walker and Karen Almquist, that she had a vaccine reaction and yet, nine days after she told Ms. Almquist, she did not inform her PCP Dr. Birnbaum that she had a right painful shoulder due to vaccination.  Petitioner's first explanation for why she did not tell any doctor that her right shoulder was painful after she returned from Durham, NC, for a year because she did not connect the vaccine to her painful right shoulder is not credible.

Petitioner denied in her affidavits and on the witness stand that she ever had a painful right shoulder before her flu vaccination on September 12, 2012.  However, the medical records record that on May 16, 2012, four months before petitioner received flu and Pneumovax vaccinations on September 11, 2012, petitioner saw her PCP Dr. Birnbaum because of chest pain.  Petitioner had gone to John Muir Hospital Emergency Room by ambulance in the middle of the night on May 15, 2012 because of pain, but the ER sent her home without a diagnosis.  (She told the person taking messages at Sutter Bay that she thought she was having a heart attack.)  The ER doctor thought she might have pleuritic inflammation of the chest wall.  Petitioner told Dr. Birnbaum that she thought her pain might be related to playing the guitar.  Petitioner had been doing extensive guitar playing, spending three hours a day playing the guitar in preparation for a concert.  After performing a physical examination, during which Dr. Birnbaum discovered petitioner had musculoskeletal tenderness in her posterior axilla (arm pit) and pectoralis attachment bilaterally, Dr. Birnbaum diagnosed petitioner with thoracic outlet syndrome likely due to repetitive injury from extensive guitar playing.  Petitioner needed advice on positioning her body during guitar playing and she needed a home exercise program.  Petitioner denied on the witness stand that Dr. Birnbaum was a reliable recorder of information.  The undersigned finds petitioner's accusation that Dr. Birnbaum was unreliable not credible.

Petitioner testified that she called Dr. Lewis on September 24, 2012 because of her right shoulder pain but no record of petitioner's calls to Sutter Health Sutter East Bay on September 24, 2012 reflect that happened.  She notes in her date book under September 24, 2012 to call Dr. L re: shoulder, but the Sutter East Bay phone records show petitioner called her gynecologist Dr. Lanner-Cusin (a different Dr. L.) to request Dr. Lanner-Cusin order a bone density test (DEXA) for petitioner's osteoporosis.  She testified that she took to heart Dr. Lewis's "promise" that she would get better.  She also called Dr. Lewis her PCP in 2012.  But she conflated July 3, 2013 when she went to Dr. Lewis and stated she had shifted from Dr. Birnbaum to Dr. Lewis as her PCP (as he had been in 2009).  She also conflated the time when she was diagnosed with CLL.

She testified she was diagnosed in the fall of 2012 and that Dr. Lewis did blood test after blood test. This never happened in the fall of 2012. She was diagnosed with CLL a year after the fall of 2013 when Dr. Lewis, who by then was her PCP, noted her increased white blood cell count on an annual blood test and then referred her to an oncologist whom she saw on November 1, 2013. Petitioner has an extraordinarily poor historical memory. Petitioner's second explanation for why she did not tell any doctor until a year after she returned from Durham, NC, that her right shoulder was painful was because she took to heart Dr. Lewis's supposed advice that she would get better is not credible.

The undersigned cannot comprehend why Dr. Neelon wrote a note to petitioner on September 27, 2017, saying petitioner is a trustworthy medical historian. (His note states, "I do not have any information related directly to the medical condition under consideration, but I wanted to go on record as being in support of her as a trustworthy medical historian.") Petitioner is completely untrustworthy as a medical historian. She confused the year Dr. Lewis was her PCP, conflating 2013 with 2012. She confused when she was diagnosed with CLL, again conflating 2013 with 2012. She completely denied the truth of Dr. Birnbaum's medical record on May 26, 2012 that she had been excessively playing the guitar three hours a day with improper posture, yet in September 2013, a year after vaccination, she complained to Dr. Lewis that she had a painful right shoulder, right hand, right forearm, and knee, all of which she attributed to her guitar playing.

Petitioner's first visit to a doctor after petitioner's return from Durham, NC, on September 19, 2012 was to her gynecologist Dr. Lanner-Cusin on November 12, 2012 for her annual visit. Petitioner did not mention to Dr. Lanner-Cusin she had a painful right shoulder. In a 14-point review of systems, petitioner omitted any mention of her right shoulder.

On December 17, 2012, petitioner saw Dr. Birnbaum, her then-PCP, for her annual visit. This visit was nine days after petitioner allegedly told massage therapist Karen Alquist that she had a vaccine reaction three months earlier. Yet petitioner did not inform Dr. Birnbaum she had a painful right shoulder. Petitioner told Dr. Birnbaum that she loved playing the guitar and singing, and she had been performing at open mikes. When Dr. Birnbaum did a functional evaluation of petitioner, she asked petitioner if she needed help with bathing, telephone use, transportation, or shopping. Petitioner said "no" to whether she needed help with each activity. Dr. Birnbaum asked petitioner if she needed help with preparing meals and doing housework and laundry. Petitioner again said "no." Petitioner says she interpreted these questions as inquiring whether she needed in-home care. Petitioner's excuse is not credible. Giving a complete and truthful answer to Dr. Birnbaum's questions and revealing any physical problems she had was petitioner's responsibility. Petitioner's testimony is not credible.

Petitioner's third explanation for not telling any doctor that her right shoulder hurt after her September 11, 2012 vaccinations was she accommodated her painful right shoulder by switching how she played guitar and handled household activities. This flies in the face of petitioner's medical records which show she went to see Dr. Birnbaum on December 17, 2012 and told her she was happy and playing the guitar as usual at open mikes. Petitioner has again

44

conflated time.  What she experienced during the following year (2013) when she relentlessly practiced guitar and her osteoarthritis worsened was an increase in pain, sending her to Dr. Lewis on September 19, 2013 to complain of a painful right shoulder, painful right arm, painful right thumb, and painful knee all of which she related to her guitar playing.  When, in early December 2013, she fell off a stool onto her right shoulder followed by another fall onto her right shoulder in January 2014 (which she testified she does not remember), she sought orthopedic help and x-ray analysis.  Petitioner's third explanation for not telling any doctor for a year after she returned from Durham, NC, that her right shoulder hurt is not credible.

Petitioner's fourth explanation for why she did not tell any doctor that her right shoulder was painful for a year after her return from Durham, NC, is that she did not consider it a significant medical problem.  She testified she did not consider it a medical problem at all.  This explanation is not credible since it flies in the face of petitioner's visit to Dr. Birnbaum on May 16, 2012 (prevaccination) because of such pain that she thought she was having a heart attack, but which Dr. Birnbaum attributed to excessive guitar playing and improper posture.  It also flies in the face of her visit to Dr. Lewis on September 13, 2013 (one year postvaccination) because her right shoulder, right arm, right thumb, and knee were painful, which she attributed to guitar playing.  The only credible explanation for petitioner not complaining to Dr. Lanner-Cusin in November 2012 and to Dr. Birnbaum in December 2012 that ever since the vaccination on September 11, 2012, her right shoulder had been painful is that her right shoulder was not painful in November and December 2012.  It became painful gradually over the following year. Petitioner's testimony is not credible.

Petitioner's fifth explanation for why she did not tell any doctor that her right shoulder was painful until a year after her return from Durham, NC, was to admit she has no idea.

Petitioner's sixth explanation for why she did not tell any doctor that her right shoulder was painful until a year after her return from Durham, NC, was that she did not know anything about SIRVA at the time, and even her doctors had not heard of it and she had to educate them. The undersigned explained to petitioner that the undersigned does not expect petitioners to diagnose themselves but does expect that a petitioner will tell a doctor if a particular part of her body is painful.  Petitioner's explanation for not informing a doctor until a year after her return from Durham, NC, that her right shoulder was painful because she did not know about SIRVA until after a year is not credible.

Petitioner has osteoarthritis in her neck, spine, both hips, both shoulders, and both knees. She had her right knee replaced and is avoiding replacing her left knee for as long as she can stand the pain.  She has right carpal tunnel and right cubital (elbow) tunnel syndromes probably because of her guitar playing.  She is right-hand dominant.  Her left shoulder is not nearly as painful as her right shoulder, but then she did not fall on her left shoulder twice as she did her right shoulder, and she does not use her left arm as much as she uses her right arm, particularly when playing the guitar.  Osteoarthritis is a degenerative disease that commonly afflicts the elderly.  Petitioner has gotten worse over time and is 78 years old.

Petitioner sees her doctors any time she has a problem, even if it does not involve pain. On March 8, 2013, petitioner called Sutter East Bay because she found a lump on her left forearm on the palm side that had increased slightly in size. She originally thought it was located in a vein, but then reported it was a quarter inch from her vein. It was approximately the size of a pencil eraser. It was not discolored and did not have streaks radiating from it. Petitioner said the lump was not interfering with her activity and she said she continued to play the guitar as normal. Petitioner had had the problem for two weeks. On March 27, 2013, petitioner saw Dr. Birnbaum, complaining about this lump on her left arm. Dr. Birnbaum's assessment was that the lumps in the veins in petitioner's arms were almost certainly the result of her recent sclerotherapy for enlarged veins in her arms and petitioner should discuss them with the surgeon. Petitioner testified that she never had sclerotherapy. Petitioner's testimony is not credible.

On December 27, 2013, she complained to Dr. Nurre about right shoulder pain. Dr. Nurre asked her what she thought was the cause. Petitioner said she could not imagine the cause of her right shoulder pain unless it was her fall off a stool onto her right shoulder earlier that month. Her history to Dr. Nurre conflicts with petitioner's testimony that she always knew that the vaccination had caused her right shoulder pain. If she knew that, how could petitioner have said to Dr. Nurre she could not imagine the cause of her right shoulder pain unless it was her fall earlier in December 2013 from a stool onto her right shoulder. Petitioner's testimony is not credible.

Petitioner saw a radiologist Dr. Hong who x-rayed her right shoulder and diagnosed her shoulder as having marked degenerative changes which might include a nondisplaced fracture. He wrote that petitioner had been experiencing increased limitation of her right shoulder range of motion, which is consistent with the degenerative nature of osteoarthritis, but this fall onto her right shoulder significantly aggravated her right shoulder pain. Three weeks later, she fell onto her right shoulder again increasing her pain.

After petitioner was diagnosed, she then went on the internet and researched shoulder pain. She discovered that people complained of reacting to vaccinations with shoulder pain called SIRVA. Petitioner remembered that she had become ill with a low-grade fever, fatigue, and aching in both shoulders after her September 11, 2012 vaccinations and she put those two events together, ignoring her lack of complaints about shoulder pain from the time she returned to northern California on September 19, 2012 until she saw Dr. Lewis on September 19, 2013.

When petitioner saw Dr. Lanner-Cusin in November 2012 for her annual gynecological visit, the September 11, 2012 vaccinations meant so little to petitioner that she gave Dr. Lanner-Cusin the wrong date for her flu vaccination and omitted entirely that she had received Pneumovax vaccine. That is how unimportant these vaccinations were to petitioner at the time.

None of petitioner's treating doctors supports her allegations. Dr. Neelon, whom she describes as wonderful, declined to offer petitioner evidentiary support of causation when she contacted him. Dr. Neelon was petitioner's PCP when she was at the Rice Clinic in Durham, NC, since 2005 to lose weight. Another treating physician, Dr. Lewis, petitioner's PCP in 2009

46

and in 2013, refused to support petitioner's allegations.  In addition, the expert orthopedic surgeon, Dr. Howard Cohen, to whom petitioner's counsel sent her in order to get his expert support for her allegations, refused to participate in this case.  Petitioner told Dr. Cohen that her fall off a stool onto her right shoulder in December 2013 might have significantly aggravated her pre-existing osteoarthritis.

Petitioner has not filed any medical record or medical opinion in support of her allegations.  Under 42 U.S.C. § 13(a)(1), the undersigned may not rule in petitioner's favor based solely on her allegations unsubstantiated by medical records or medical opinion.  After petitioner went on the internet and became convinced that she had SIRVA, the fact that she subsequently gave a history of vaccine injury does not constitute substantiation because none of these records was contemporaneous with her vaccination.

Petitioner has the support of her husband about her condition.  His loyalty and affection for her do not override the absence of any complaint of right shoulder pain after she returned from Durham, NC, in September 2012 until one year later in September 2013 when she told Dr. Lewis that her right shoulder, right arm, right thumb, and knee were painful, which she attributed to guitar playing.  After she fell off a stool in December 2013 onto her right shoulder, causing pain which sent her to Dr. Nurre, and then to Dr. Hong, the radiologist, and to orthopedists, she learned she has severe osteoarthritis of her right shoulder.  Moreover, petitioner's husband's testimony does not override the requirement of the Vaccine Act that either medical records or medical opinion must support petitioner's allegations.

## Further Findings

## In Which Arm Did Petitioner Receive Flu Vaccine?

Petitioner received two vaccinations on September 11, 2012, only one of which, flu vaccine, is a Table vaccine under the Vaccine Act.  The Vaccine Act does not grant authority to the undersigned to decide whether or not petitioner's Pneumovax vaccination resulted in an injury.

The pharmacist who administered the vaccines to petitioner was Hemal Modi, RpH ("Registered Pharmacist") who has both a bachelor's degree and master's degree in pharmacy.  He wrote in a vaccine record that he administered flu vaccine to petitioner on September 11, 2012 in her left arm.  That means that he vaccinated petitioner with Pneumovax either in her left arm (unlikely) or her right arm (likely).  Since the vaccine to which petitioner affixes blame for her arthritic right shoulder pain is flu vaccine, petitioner cannot prevail on an allegation that flu vaccine administered in her left shoulder caused her right shoulder pain.  Petitioner admitted during her testimony that she cannot really know in which arm pharmacist Modi administered flu vaccine.

Petitioner filed excerpts from her date book showing that she noted in her date book the reverse location for her flu and Pneumovax vaccinations, i.e., that pharmacist Modi gave her

47

Pneumovax in her left arm and flu vaccine in her right arm.  She recounts a conversation with pharmacist Modi that he agreed to that sequence because she had never had Pneumovax vaccine before whereas she almost yearly receives flu vaccine.  Therefore, in a right-hand dominant person, it would be safer to administer the vaccine she had never received before in her left arm.  There is no evidence that this conversation ever took place except petitioner's testimony.  She has pursued pharmacist Modi in numerous phone calls and emails, all of which he has refused to answer, according to petitioner.

In light of the undersigned's finding that petitioner's testimony in general is not credible, the undersigned finds in particular she is also not credible.  For example, she gave her age when she received another flu vaccination in 2011 as under 65 when she was 71.  She misstated the date of the flu vaccination to Dr. Lanner-Cusin and omitted mentioning she even received Pneumovax vaccine, yet she testified that the reason she wrote the dates and contents of the vaccines (as well as the arms inoculated) in her date book was to advise her doctors back in California since they would not have a record of her vaccinations administered in Durham, NC.  She confused when she switched her primary care physician from Dr. Birnbaum to Dr. Lewis.  She confused when she was diagnosed with CLL and was off by over a year.  She thought it was Dr. Lewis who had done blood testing on her in the fall of 2012, but he did the blood testing that led to her diagnosis of CLL in 2013.  When petitioner wrote her affidavit, she omitted that she saw Dr. Birnbaum on May 16, 2012 for chest pain which Dr. Birnbaum diagnosed as thoracic outlet syndrome due to petitioner's playing guitar three hours a day with improper posture.  During her testimony, petitioner denied the accuracy of this medical record.  During her testimony, petitioner thought her gynecologist's name was Dr. Birnbaum, not Dr. Lanner-Cusin.  Petitioner is unreliable as to dates, names, and occurrences.  The article from the Archives of Neurology that she filed as Exhibit 36 states women are twice as likely to confuse right and left.  Because of petitioner's repeated confusion and unreliability, the undersigned finds her testimony and date book entry for September 11, 2012 are not credible.  As petitioner recognized on the witness stand, she has no way of knowing in which arm pharmacist Modi administered flu vaccine.

The undersigned credits pharmacist Modi's professional competency and the vaccine record's accuracy over petitioner's date book entry and her confused memory of events in her testimony and affidavit.  The United States Court of Federal Claims has held that a vaccine record "may be extremely probative evidence."  Horner v. Sec'y of HHS, 35 Fed. Cl. 23, 28 (1996).  In this case, it certainly is.

The undersigned finds that petitioner received flu vaccine in her left arm and, therefore, had no reasonable basis to file her petition alleging that flu vaccine caused her initial claim of a right frozen shoulder or her subsequent claims that flu vaccine caused her brachial neuritis, SIRVA, or significant aggravation of her osteoarthritis.

### If Petitioner Did Receive Flu Vaccine in her Right Arm, Did She Have a Vaccine Reaction?

Suppose arguendo petitioner did receive flu vaccine in her right arm, did she have a vaccine reaction? Within one day after vaccination, petitioner became ill, with low-grade fever, fatigue, aching in both shoulders, and redness and tenderness presumably at the injection sites. Dr. Neelon, her PCP in Durham, NC, when she was at the Rice House, diagnosed her with a viral illness. He also had blood drawn on September 18, 2012, which showed a slightly elevated white blood cell count of 11,600 (the upper range of normal being 10,800). Petitioner testified that Dr. Neelon was wrong. She said her slightly elevated white blood cell count was a reflection of chronic lymphocytic leukemia ("CLL"). In her mind, she was reacting to her vaccinations. Also in her mind, she testified she was diagnosed with CLL in the fall of 2012, but Dr. Lewis discovered petitioner's CLL serendipitously after a standard blood test on November 1, 2013, 14 months later, when petitioner's white blood cell count was 18,600. Petitioner then received a diagnosis of stage zero CLL. She has never had symptoms of CLL and is not receiving treatment for CLL because it is so mild. If her white blood count on September 12, 2012 reflected CLL instead of a viral illness, her symptoms of low-grade fever, fatigue, and aching in both shoulders did not reflect CLL because she has never had symptoms of CLL. Moreover, whether or not her white blood count, slightly elevated on September 21, 2012, reflected incipient CLL or viral illness, there is no reason to assume that Dr. Neelon's diagnosis of viral illness is wrong and petitioner's conclusion she had a vaccine reaction is right. Petitioner admitted on the witness stand that she is not a medical doctor.

Firstly, Dr. Neelon is a medical doctor, trained at Harvard Medical School. Secondly, when Dr. Neelon, who has been treating petitioner since 2005, sees a medical problem for which he wants her to have further testing, he sends petitioner to Duke Medical Center, a facility in which he has medical privileges. He did not send petitioner to Duke on September 12, 2012 because he expected her to recover from her viral illness, which she did. The undersigned accepts Dr. Neelon's diagnosis that petitioner had a viral illness, not a vaccine reaction. The undersigned finds that petitioner did not have a vaccine reaction.

**If Petitioner Did Receive Flu Vaccine in her Right Arm and
Did Have a Vaccine Reaction, How Long Did the Reaction Last?**

Suppose arguendo that petitioner did receive flu vaccine in her right arm and did have a vaccine reaction, how long did this reaction last? In addition to consulting Dr. Neelon in person when she became ill on September 12, 2012, petitioner phoned Sutter Health Sutter East Bay where her medical treaters were in northern California and spoke to someone on September 24, 2012 for 17 minutes at 4:30 p.m. Eastern time which was 1:30 p.m. Pacific time. There is no record of the contents of this call or to whom petitioner spoke. She testified she spoke to Dr. Michael H. Lewis, but he did not resume being her PCP until July 3, 2013 after she transferred her care from Dr. Birnbaum to Dr. Lewis. Petitioner first testified that she spoke to him at his home, but then said that she called him at the office where he was with a patient and whoever answered the phone put her on hold until Dr. Lewis picked up the phone.

Petitioner testified Dr. Lewis was dismissive about her whole experience and said she had nothing to worry about. She testified he said people have unusual reactions to vaccines and it

would go away by itself.  She further stated she remembers his words: "I promise you it will go away by itself, so don't worry about it."  She testified that she did not contact any doctor when she returned from Durham, NC, on September 19, 2012 because she took Dr. Lewis's words to heart and saw no reason to make an appointment because she was going to be fine.  She said she had been seeing him a number of years and this was his professional opinion.

The undersigned has read all of petitioner's medical records.  Petitioner has always sought medical attention when she is in pain.  She has anxiety disorder, panic disorder, and insomnia which is not relieved unless she is on drugs.  Her doctors are quite aware that she is not a calm, uncomplaining patient.  Petitioner filed 148 pages of calls she made to Sutter Health Sutter East Bay Medical Foundation dating from February 17, 2009 to August 29, 2017.  She is constantly fearful and upset.  When Dr. Lewis became petitioner's PCP on July 3, 2013 (10 months after her vaccinations in September 2012), he was a careful and very patient recorder of petitioner's frequent complaints and persistent demands, which she made both by phone to the office and by the portal Sutter East Bay had for patient communication.  Petitioner gave him her prior medical records to review so that he could support her allegations in this case.  He read them and refused her request that he testify on her behalf.  Even when petitioner tried to coax him to testify by offering him $300 to $500 an hour, he refused.  The undersigned respects his integrity as the undersigned respects the integrity of Dr. Neelon who also refused to support petitioner's allegations even though he has a personal friendship with her.

The undersigned has no idea what the contents of the conversation petitioner testified she had on September 14, 2012, but if she did speak to Dr. Lewis and he said that petitioner would recover in a few days, he was right.  When she returned from Durham, NC, she did not see any doctor until November 2012 and that was Dr. Lanner-Cusin, her gynecologist, for her annual gynecological examination.  Petitioner never complained of having right shoulder pain.

Petitioner saw her then-PCP Dr. Birnbaum in December 2012 and never complained of having right shoulder pain.  When Dr. Birnbaum asked her if she needed help with activities of daily living, such as bathing, telephone use, transportation, shopping, preparing meals, housework, or laundry, petitioner said no to each.  She did not need help with activities of daily living.  Petitioner's attempt to explain away during testimony that her "no" to Dr. Birnbaum was really "yes" because she was going through all kinds of postural adaptations to make doing daily activities possible is not credible.  Petitioner's second explanation that she thought these questions were aimed at determining if petitioner needed in-home care is also not credible.

If petitioner had received flu vaccine in her right arm and had a reaction, it did not last more than six months.  The Vaccine Act, 42 U.S.C. § 11(c)(1)(D)(i), requires petitioner to suffer the residual effects or complications of a vaccine reaction for more than six months.  The undersigned finds that petitioner failed to meet this statutory requirement.

### If Petitioner Did Receive Flu Vaccine in Her Right Arm and Had a Vaccine Reaction, Did it Significantly Aggravate Her Pre-existing Osteoarthritis?

Petitioner alleged in her amended petition that flu vaccine significantly aggravated her pre-existing osteoarthritis.  There is no proof in the medical records or in expert medical opinion that flu vaccine significantly aggravated petitioner's pre-existing osteoarthritis.  (This is assuming that she even had a vaccine reaction lasting more than six months).  There is proof that her fall off a stool onto her right shoulder in December 2013 significantly aggravated her pre-existing osteoarthritis because only after that fall onto her right shoulder did she go to Dr. Nurre and complain of right shoulder pain due to the fall off the stool, whereas in September 2013, she complained to Dr. Lewis that her right shoulder pain was due to guitar playing.  Moreover, she told Dr. Cohen, the orthopedist to whom petitioner's attorney sent her to obtain support for her allegations (which he refused to give), that her fall off a stool onto her right shoulder may have made her pain worse.

The undersigned finds that petitioner has failed to prove her allegation of significant aggravation of her pre-existing osteoarthritis due to vaccination.

### If Petitioner Did Receive Flu Vaccine in Her Right Arm, Did She Have Brachial Plexitis?

Petitioner also alleged in her amended petition that flu vaccine caused her brachial plexitis.  Petitioner has never had brachial plexitis and no doctor has ever diagnosed her with brachial plexitis.  A doctor, in discussing vaccine injuries with petitioner, mentioned that brachial plexitis can be a vaccine reaction.  However, after petitioner underwent an electromyography ("EMG") and nerve conduction study ("NCS"), the examiner wrote that she did not have brachial neuritis.  The undersigned finds petitioner did not have brachial neuritis.

### If Petitioner Did Receive Flu Vaccine in Her Right Arm, Did She Have SIRVA?

Although petitioner did not allege SIRVA in her original petition or in her amended petition, she testified that she also did not tell any doctor that her right shoulder was painful because how could she know she had SIRVA (until she went on the internet) when her doctors did not even know what SIRVA was and she had to give them medical articles to educate them about SIRVA.  Petitioner has spent a lot of time on the internet and not only got the idea that flu vaccine injured her shoulder from her internet research, but also that flu vaccine was administered too high on her shoulder.

The fact that other vaccinees experienced SIRVA does not mean that petitioner did.  Again, petitioner is trying to excuse the fact that she never complained for one year after returning from Durham, NC, about her right shoulder being painful until she went to Dr. Lewis and attributed her right shoulder, right arm, right thumb, and knee pain to guitar playing.  Then, three months later, after she fell off a stool onto her right shoulder, she omitted any thought that she had a vaccine injury because she told Dr. Nurre she could not imagine what caused her right shoulder pain unless it was the fall.

In addition, SIRVA requires more than six months of sequelae.  The undersigned finds that petitioner did not have SIRVA.

51

No one could have worked harder on a case than petitioner.  She filed 80 exhibits in a case for which she had no reasonable basis to proceed.  She has been to various and sundry doctors for a multiplicity of complaints and illnesses.  The undersigned has sympathy for petitioner's pain due to osteoarthritis and her fear that her CLL may one day become more than stage zero.  However, sympathy and hard work do not equate proof.

Besides alleging illnesses she does not have (brachial neuritis, SIRVA), her allegations fly in the face of the opinions of two treating doctors, Dr. Neelon and Dr. Lewis, who refused to support her allegations, and of the opinion of a potential expert witness, Dr. Cohen, who also said he could not support her allegations.  Petitioner has truncated her experience to obviate the existence of 12 months during which she remained silent to doctors about right shoulder pain and indicated to her doctors that she was playing the guitar as usual.  Petitioner rejects the accuracy of any medical record, either prevaccination or postvaccination, that is contrary to her testimony.  Petitioner's allegations and testimony are not credible.

This case is dismissed for failure to make a prima facie case of causation in fact.

## CONCLUSION

This petition is **DISMISSED**.  In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[24]

**IT IS SO ORDERED.**

Dated:  April 19, 2018                               /s/ Laura D. Millman
                                                                    Laura D. Millman
                                                                    Special Master

---

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.